**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SABRINA TIMMINS, HOLLY JOHNSON, CLYNELL MICKEY, and ELMIRA HOBBS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN FAMILY INSURANCE COMPANY and AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., Wisconsin corporations, <br><br> Defendant. | Case No. 3:22-cv-00214 <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

<u>**THIRD AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs Sabrina Timmins, Holly Johnson, Clynell Mickey, and Elmira Hobbs (collectively, "Plaintiffs"), by and through undersigned counsel, bring this class action, individually and on behalf of all others similarly situated, against Defendants American Family Insurance Company ("American Family") and American Family Mutual Insurance Company, S.I. ("American Family Mutual") (collectively, "Defendants") and allege as follows:

**INTRODUCTION**

1.      This class action lawsuit arises from Defendants' deceptive, fraudulent, and unfair scheme through which Defendants systematically undervalue total-loss vehicles in order to arbitrarily reduce the ultimate payment to insureds who make total loss claims under insurance policies issued by Defendants.

2.      In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendants' uniform insurance policies with Plaintiffs and all putative Class members ("Class," defined below) promise to pay for the loss, limited to the actual

cash value ("ACV") of the vehicle. Attached as **Exhibit A** are copies of Timmins' American Family policy and Johnsons' American Family Mutual policy ("Policy"), which are materially identical to the policies that provides coverage to the other Plaintiffs and to all members of the Class.

3.      Defendants' standardized policy language as to coverage for the ACV of total-loss vehicles is present in every auto policy issued by Defendants.

4.      Pursuant to the basic tenets of insurance law, once Defendants elect to pay ACV, they are bound by that election and cannot thereafter change their mind and decide to later pay the cost to repair or replace the amount of loss. *See* 12A Couch on Ins. § 176.23. Put differently, when Defendants declare a vehicle a total loss and voluntarily invoke their limitation of liability, they are obligated under their insurance Policy to pay the ACV of the vehicle to the insured.

5.      Defendants ignore and avoid their straightforward contractual obligation to pay ACV by directing their third-party vendor, Audatex or AudaExplore, to systematically reduce total loss valuations by applying a so-called "typical negotiation adjustment" to "comparable vehicles" that purportedly reflects some sort of average difference between a dealer list price and selling price. The "typical negotiation adjustment" is a significant downward adjustment to the base values of comparable vehicles used to determine the ACV of total loss vehicles, which ranges from 4-11% of the value of the "comparable vehicle." Vehicles with lesser value are subject to a greater percentage reduction, with the percentage adjustment becoming lower as the value of the "comparable vehicles" increases. This percentage reduction artificially reduces the total-loss payment for the totaled vehicle and, with the sliding percentage scale, ensures that every total-loss payment Defendants make to insureds is significantly, but unconscionably, reduced. By artificially reducing ACV through the "typical negotiation adjustment," Defendants pay less than a vehicle's ACV and breach their contractual obligation to pay ACV after total-loss incidents.

2

6.      The "typical negotiation adjustment" is not based on actual negotiations, typical or otherwise, it is contrary to appraisal standards, and is not based on any market realities. Instead, Defendants "cook the books" with respect to the data they rely on to purportedly support the application of a "typical negotiation adjustment" in order to create a manufactured data set. They do this by, among other things, removing from the data set any instances in which a car is sold at a price equal to or greater than the list price. In other words, Defendants remove any data that demonstrates reductions through negotiations are *not* typical, and remove any data points that contradict the faulty assumption that car buyers *always* negotiate a lower price of the list price.

7.      Moreover, the concept of a "typical negotiation adjustment" does not reflect current market realities. The used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply do not negotiate off of Internet advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's cash value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Defendants ignore these inconvenient market realities and pay insureds and claimants below-market prices for their totaled vehicles.

8.      Notably, Audatex's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions—does not apply typical negotiation adjustments. Instead, CCC Intelligent Solutions uses list prices.

9.      Plaintiffs take no issue with Defendants' general use of Audatex's Autosource Market-Driven Valuation ("Autosource") database as containing an adequate number of comparable vehicles to determine ACV. This lawsuit challenges only Defendants' application of

an unsupported "typical negotiation adjustment" to those comparable vehicles to artificially reduce the amount of its ACV payment to insureds. Indeed, the evidence suggests that the option to apply a "typical negotiation adjustment" can be toggled off as Audatex does not apply this adjustment in some states on behalf of certain insurance companies.

10.     An integral part of Defendants' fraudulent scheme is a provision of Policy which requires the parties to submit to an appraisal if there is a disagreement over the loss. As designed, the appraisal clause prevents Plaintiffs and the Class from effectively vindicating their statutory and common law causes of action. In any event, this case asks the singular question of whether Defendants can apply an arbitrary and made-up calculation—based on manipulated data and faulty assumptions—to artificially reduce the value of insured vehicles and associated insurance payouts. That question cannot be resolved through the appraisal process.

11.     Through Defendants' deceptive scheme of devaluing total-loss vehicles, Defendants breached their contracts and the covenant of good faith and fair dealing with their insureds.

12.     As a result of Defendants' breaches, Plaintiffs did not receive the benefit of their bargain, and thus sustained actual damages.

13.     By this action, Plaintiffs, individually and on behalf of the Classes, seek damages and injunctive and declaratory relief.

## PARTIES

14.     Plaintiff Sabrina Timmins, at all relevant times, was a Kansas citizen. Timmins owned a 2015 Nissan Altima 2.5 S 4D Sedan that was insured under a Policy issued by American Family, which was deemed a total loss on or around October 5, 2018. Timmins made a claim with American Family for the total loss of the vehicle. American Family provided a total loss valuation to Timmins for the total loss claim. American Family based its offer upon a valuation report

obtained from Audatex. American Family valued Timmins' total loss claim at $5,942.00. The market valuation report listed values of five different comparable vehicles and shows that American Family and its vendor applied a "typical negotiation adjustment" of approximately 7% to all comparable vehicles without itemizing or explaining the basis of each adjustment and/or how the value of the deduction was determined. *See* Timmins' Market Value Report at 3-4, attached as **Exhibit B**.

15.     Plaintiff Holly Johnson, at all relevant times, was a Missouri citizen. Johnson owned a 2007 Chevrolet Cobalt LS 2D Coupe that was insured under a Policy issued by American Family Mutual, which was deemed a total loss on or around May 27, 2016. Johnson made a claim with American Family Mutual for the total loss of the vehicle. American Family Mutual provided a total loss valuation to Johnson for the total loss claim. American Family Mutual based its offer upon a valuation report obtained from Audatex. American Family Mutual valued Johnson's total loss claim at $5,853.00. The market valuation report listed values of five different comparable vehicles and shows that American Family Mutual and its vendor applied a "typical negotiation adjustment" of approximately 9% to all comparable vehicles without itemizing or explaining the basis of each adjustment and/or how the value of the deduction was determined. *See* Johnson's Market Value Report at 3-4, attached as **Exhibit C**.

16.     Plaintiff Clynell Mickey, at all relevant times, was a Minnesota citizen. Mickey owned a 2015 Nissan Sentra S 4D Sedan that was insured under a Policy issued by American Family, which was deemed a total loss on or around November 3, 2018. Mickey made a claim with American Family for the total loss of the vehicle. American Family provided a total loss valuation to Mickey for the total loss claim. American Family based its offer upon a valuation report obtained from Audatex. American Family valued Mickey's total loss claim at $7,323.00. The market valuation report listed values of one different comparable vehicle and shows that American Family

and its vendor applied a "typical negotiation adjustment" of approximately 6% to all comparable vehicles without itemizing or explaining the basis of each adjustment and/or how the value of the deduction was determined. *See* Mickey's Market Value Report at 3-4, attached as **Exhibit D**.

17.     Plaintiff Elmira Hobbs, at all relevant times, was a Wisconsin citizen. Hobbs owned a 2014 Nissan Versa 1.6SV 4D Sedan that was insured under a Policy issued by American Family, which was deemed a total loss on or around May 29, 2018. Hobbs made a claim with American Family for the total loss of the vehicle. American Family provided a total loss valuation to Hobbs for the total loss claim. American Family based its offer upon a valuation report obtained from Audatex. American Family valued Hobbs' total loss claim at $8,355.00. The market valuation report listed values of five different comparable vehicles and shows that American Family and its vendor applied a "typical negotiation adjustment" of approximately 8% to all comparable vehicles without itemizing or explaining the basis of each adjustment and/or how the value of the deduction was determined. *See* Hobbs' Market Value Report at 3-4, attached as **Exhibit E**.

18.     Defendant American Family Insurance Company is a Wisconsin company with its principal place of business in Wisconsin. American Family provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. American Family is a subsidiary of American Family Insurance Group.

19.     Defendant American Family Mutual Insurance Company, S.I. is a Wisconsin company with its principal place of business in Wisconsin. American Family Mutual provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. American Family Mutual is a subsidiary of American Family Insurance Group.

**JURISDICTION AND VENUE**

20.     This Court has personal jurisdiction over Defendants because Defendants reside in Wisconsin. Defendants direct, market, and provide their business activities throughout the State of Wisconsin and make their insurance services available to residents of Wisconsin. Further, this Court has personal jurisdiction over Defendants because Defendants' tortious conduct against Plaintiffs occurred in substantial part within this District and because Defendants committed the same wrongful acts to other individuals within this judicial District, such that some of Defendants' acts have occurred within this District, subjecting Defendants to jurisdiction here.

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member of the putative class, including certain Plaintiffs, are citizen of states outside Wisconsin, and Defendants are citizens of Wisconsin, thus CAFA's minimal diversity requirement is met. Additionally, Plaintiffs seek an award of damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiffs and the Class in an amount to be determined at trial, for each violation, which, when aggregated among a proposed class of potential thousands, exclusive of interests and costs, exceeds the $5,000,000 threshold for federal jurisdiction under the Class Action Fairness Act ("CAFA").

22.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events giving rise to the claim occurred in this District, and because certain Plaintiffs were injured in this District.

**FACTUAL ALLEGATIONS**

A.     **"Typical Negotiation"**

23.     When valuing total-loss automobile claims, insurance companies like Defendants use third-party companies with databases of vast numbers of comparable vehicles. Defendants

utilize those third-party databases to determine and pay the ACV of an insured's totaled vehicle subject only to reduction for any policy deductible.

24.     To avoid full payment under their policies, Defendants have devised a blatant and unlawful scheme to reduce their total-loss payments to insureds by use of a deceptive, arbitrary and baseless "typical negotiation adjustment."

25.     Specifically, Defendants purport to determine the ACV of total-loss vehicles via a third-party vendor, Audatex or AudaExplore, through a system called Autosource. The Autosource system identifies the price of comparable vehicles sold or listed for sale online in the relevant market from a database of voluminous data points of sold and listed prices for comparable vehicles.

26.     Autosource then, at Defendants' directive, applies a deceptive and arbitrary "typical negotiation adjustment" to the value of the comparable vehicles before determining the total-loss payment Defendants will make.

27.     Defendants' "typical negotiation adjustment" is arbitrary and unsupportable. When offering the total-loss payment to an insured whose car was totaled, Defendants represent that the "typical negotiation adjustment" reflects some sort of average difference between a dealer list price and selling price. *See* Ex. B at 3 ("The selling price *may* be substantially less than the asking price. In the case of this 2015 Nissan Altima, the difference between the asking price and the selling price is generally 7%."). This disclosure is never made prior to determining the total-loss payment Defendants will make.

28.     But the "typical negotiation adjustment" is not based on any negotiations, typical or otherwise, it is contrary to appraisal standards, and is not based on any market realities. Instead, Defendants and their vendor "cook the books" with respect to the data they rely on to purportedly support the application of a "typical negotiation adjustment" in order to create a manufactured data set. They do this by, among other things, removing from the data set any instances in which a car

8

is sold at a price equal to or greater than the list price. These data points that Defendants exclude from consideration controvert their unsupported theory that car buyers always negotiate a lower price of the list price such that it would be appropriate to apply a "typical negotiation adjustment" to lower the value of comparable vehicles used to value total loss vehicles.

29.     Moreover, the across-the-board 4-11% reduction on used vehicles' internet prices does not reflect market realities, and neither relevant state insurance laws and regulations nor the Policy permit Defendants to make this arbitrary deduction. Indeed, Defendants apply the "typical negotiation adjustment" without contacting the identified dealerships or sellers, or considering whether the online retailer ever discounts their vehicles. Notably, in applying a universal percentage-based "typical negotiation adjustment" reduction, Defendants failed to consider that it is increasingly the practice in the used car market to avoid price negotiation by implementing "no haggle" pricing, particularly as to internet-posted prices.[1] Indeed, in addition, particularly during the COVID-19 pandemic, and the related supply chain problems with parts such as electronics for vehicles, used cars have been selling for a premium, with sale price typically *increasing* from posted price if it changes at all.[2]

30.     Rather, the arbitrary "typical negotiation adjustment," ranging from 4-11% of the value of the comparable vehicle is keyed only to the value of that vehicle, as the value of the "comparable vehicles" increases. This sliding percentage scale does not reflect "actual value" of

---

[1] *See, e.g.*, https://www.autonationlincolnclearwater.com/autonation-one-price.htm (last visited Sept. 24, 2021) ("Not only is our no-haggle price low, it's guaranteed."); https://www.carmax.com/about-carmax (last visited May September 26, 2021) ("our 'no-haggle' prices transformed car buying and selling from a stressful, dreaded event into the honest, straightforward experience all people deserve.").

[2] *See*          https://www.cnbc.com/2021/08/07/used-car-prices-to-stay-high-until-automakers-fix-production-issues.html (last visited Sept. 16, 2021); https://abc7chicago.com/car-chip-shortage-2021-prices-auto-gm-closes-factories/11005980/ (last visited Sept. 16, 2021).

the vehicle vehicles or any "typical negotiation," but rather is meant to ensure that Defendants' total loss payments are significantly reduced, even when a vehicle is not valuable.

31.     Plaintiffs do not contest the vehicles Defendants selected to use as comparable vehicles. Plaintiffs do not contest Defendants' representations of the listed price of comparable vehicles. Plaintiffs do not contest the value assigned to differences in trim, condition, mileage, packages, and equipment between comparable vehicles and the total-loss vehicle. What Plaintiffs contest is that Defendants instructed Audatex to apply arbitrary, capricious, and invalid "typical negotiation" adjustment across-the-board in determining their total-loss payments.

**B.     Defendants' Deceptive and Unfair Appraisal Process**

32.     An integral part of Defendants' fraudulent scheme is a provision of Policy which requires the parties to submit to an appraisal if there is a disagreement over the loss. The appraisal provision requires the insured and the insurer to each hire, at their own expense, an appraiser and to bear equally the expenses of an umpire selected by the two appraisers, as well as any other expenses of the appraisal. Since the amount by which the insureds' total-loss claims are underpaid is likely less than the cost of the appraisal, Defendants know that the insureds will forego the appraisal process and accept the artificially reduced ACV of the vehicle for their total-loss claims. As designed, the appraisal clause prevents Plaintiffs and the Class from effectively vindicating their statutory and common law causes of action.

33.     This case presents a dispute over ACV, not loss, and is therefore not subject to Defendants' appraisal clause, which by its terms (if at all) only applies for disputes over loss. Rather, this case challenges Defendants' fraudulent scheme to illegally undervalue insureds' vehicles that are declared a total loss, in order to increase their own profits. This is an issue that cannot be resolved through an appraisal process that is part of that very scheme.

34.     Moreover, the Policy is an unconscionable contract of that was unilaterally drafted by Defendants with full knowledge of the unfair scheme they intended to employ to artificially reducethe value of their insured's vehicles, and neither Plaintiffs nor the members of the Class had any rollin drafting its terms.

35.     All conditions precedent to the initiation of this suit have been satisfied.

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Classes:

> **The Kansas Class**. All Kansas citizens insured by Defendants who, from the earliest allowable time through the date of resolution of this action, received a first-party total loss valuation and payment on an automobile total loss claim that included a "typical negotiation" or similar adjustment.

> **The Missouri Class**. All Missouri citizens insured by Defendants who, from the earliest allowable time through the date of resolution of this action, received a first-party total loss valuation and payment on an automobile total loss claim that included a "typical negotiation" or similar adjustment.

> **The Minnesota Class**. All Minnesota citizens insured by Defendants who, from the earliest allowable time through the date of resolution of this action, received a first-party total loss valuation and payment on an automobile total loss claim that included a "typical negotiation" or similar adjustment.

> **The Wisconsin Class**. All Wisconsin citizens insured by Defendants who, from the earliest allowable time through the date of resolution of this action, received a first-party total loss valuation and payment on an automobile total loss claim that included a "typical negotiation" or similar adjustment.

37.     Unless otherwise stated, the state classes are collectively referred to as the "Class."

38.     Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

39.     Plaintiffs reserves their right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses under Rule 23(c)(5), or modified in any other way

40.     **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of Class members, the precise number is unknown to Plaintiffs but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

41.     **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.   whether Defendants' practice of applying a "typical negotiation adjustment" in determining total-loss payments results is a breach of their obligation to pay ACV;

b.    whether Defendants' failure to disclose their use and use of a "typical negotiation adjustment" when determining total-loss payments for a totaled vehicle until such an assessment is made is deceptive to a reasonable consumer or unconscionable;

c.   whether Defendants' practice of applying a "typical negotiation adjustment" in determining total-loss payments results is a breach of their obligation to pay ACV breached the covenant of good faith and fair dealing it has with Plaintiffs and the other Class members;

d.   whether Plaintiffs and the Class are entitled to injunctive relief based on Defendants' conduct; and

e.   whether Plaintiffs and the Class are entitled to damages and the measure of damages

owed to them.

42.     **Typicality.** Plaintiffs' claims are typical of the other Class members' claims because Defendants undertook the same practice of applying a "typical negotiation adjustment" in determining total-loss payments under materially similar policy provisions requiring payment of ACV. Plaintiffs' claims are based upon the same legal theories as those of the other Class members. Plaintiffs and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

43.     **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other Class members whom they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

44.     **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, such that it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action

device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

    **A.**      **<u>Claims on Behalf of the Kansas Class</u>**

**COUNT 1**
**BREACH OF CONTRACT**

45.     Plaintiffs repeat and re-allege all previously alleged paragraphs as if fully alleged herein.

46.     This Count is brought on behalf of the Kansas Class (for purposes of this Count, the "Class").

47.     Plaintiffs and each of the other Class members were insured under a policy issued by Defendants, as described herein.

48.     Plaintiffs and each of the other Class members made claims under their insurance contracts, which Defendants determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

49.     Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendants purported to pay Plaintiffs and each of the other Class members the ACV of their totaled vehicles.

50.     Defendants, however, failed to pay the ACV of Plaintiffs' and Class members' vehicles because Defendants applied an arbitrary and capricious "typical negotiation" adjustment to comparable vehicles in order to reduce their market value and, as a result, Defendants' total-loss payments to insureds.

51.     Defendants also failed to comply with Kansas law, which requires insurers who settle a total loss claim with a cash settlement on the basis of actual cash value to determine "the actual cost, less any deductible provided in the policy, to purchase a comparable automobile" using

14

"any source or method for determining statistically valid fair market value that meets both of the following criteria:" "(A) The source or method's database, including nationally recognized automobile evaluation publications, shall provide values for at least eighty-five percent (85%) of all makes and models of private passenger vehicles for the last fifteen (15) model years taking into account the values for all major options for such vehicles; and" "(B) the source, method, or publication shall provide fair market values for a comparable automobile based on current data available for the local market area as defined in subsection (j)(2)[,]" and provides that "When an automobile total loss is settled on a basis which deviates from the methods and criteria described in subsections (a)(1) and (a)(2)(A) and (B) of this section, the deviation must be supported by documentation giving the particulars of the automobile condition and the basis for the deviation. Any deviations from such cost, including deduction for salvage, must be measurable, discernible, itemized and specified as to dollar amount and shall be appropriate in amount. The basis for such settlement shall be fully explained to the claimant." Kan. Admin. Regs. § 40-1-34.

52.     Thus, Defendants failed to pay Plaintiffs and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached their contract with Plaintiffs and each of the other Class members.

53.     As a result of such contractual breaches, Plaintiffs and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 2
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

54.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Count, as if fully alleged herein.

55.     This Count is brought on behalf of the Kansas Class (for purposes of this Count, the "Class").

56.     Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

57.     Disputes involving the exercise of good faith arise when one party is given broad discretion in performing their obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

58.     Under the Policy, Defendants had discretion to perform their obligations under the contract, including the obligation to determine the ACV of an insured's total-loss vehicle. Defendants, however exercised their discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

59.     Defendants also failed to comply with Kansas law, which requires insurers who settle a total loss claim with a cash settlement on the basis of actual cash value to determine "the actual cost, less any deductible provided in the policy, to purchase a comparable automobile" using "any source or method for determining statistically valid fair market value that meets both of the following criteria:" "(A) The source or method's database, including nationally recognized automobile evaluation publications, shall provide values for at least eighty-five percent (85%) of

all makes and models of private passenger vehicles for the last fifteen (15) model years taking into account the values for all major options for such vehicles; and" "(B) the source, method, or publication shall provide fair market values for a comparable automobile based on current data available for the local market area as defined in subsection (j)(2)[,]" and provides that "When an automobile total loss is settled on a basis which deviates from the methods and criteria described in subsections (a)(1) and (a)(2)(A) and (B) of this section, the deviation must be supported by documentation giving the particulars of the automobile condition and the basis for the deviation. Any deviations from such cost, including deduction for salvage, must be measurable, discernible, itemized and specified as to dollar amount and shall be appropriate in amount. The basis for such settlement shall be fully explained to the claimant." Kan. Admin. Regs. § 40-1-34.

60.     As such, Defendants breached the covenant of good faith and fair dealing by, *inter alia*:

   a. Intentionally applying "typical negotiation" adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

   b. Failing to pay insureds the ACV of their total-loss vehicles;

   c. Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total- loss vehicles and avoid paying insureds the ACV on their total-loss claims;

   d. Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

61.     Defendants' breaches of the covenant of good faith and fair dealing have caused damages to Plaintiffs and the Class. Plaintiffs' and the Class members' damages include the amounts improperly deducted by Defendants from their payments to insureds on the basis of a typical negotiation adjustment.

## COUNT 3
## DECLARATORY JUDGMENT

62.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

63.     This Count is brought on behalf of the Kansas Class (for purposes of this Count, the "Class").

64.     A dispute between Plaintiffs and the Class and Defendants is before this Court concerning the construction of the auto insurance policies issued by Defendants, and the rights of Plaintiffs and the Class arising under that policy.

65.     Plaintiffs, individually and on behalf of the Class, seeks a declaration of rights and liabilities of the parties herein. Specifically, Plaintiffs seek a declaration that in paying total-loss claims by first-party insureds, it is a breach of Defendants' insurance contract, as well as a violation of law, for Defendants to base the valuation and payment of claims on values of comparable vehicles that have been reduced by arbitrary "typical negotiation" adjustments that are (a) arbitrary, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and (c) not as reasonably specific or appropriate as to dollar amount.

66.     Defendants' unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendants have breached, and continues to breach, the express terms of their contracts of insurance with Plaintiffs and members of the Class.

67.     As a result of these breaches of contract, Plaintiffs and the Class members have been injured.

**B.     <u>Claims on Behalf of the Missouri Class</u>**

## COUNT 4
## BREACH OF CONTRACT

68.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

69.     This Count is brought on behalf of the Missouri Class (for purposes of this Count, the "Class").

70.     This Count is brought by Plaintiffs individually and on behalf of the Class.

71.     Plaintiffs and each of the other Class members were insured under a policy issued by Defendants, as described herein.

72.     Plaintiffs and each of the other Class members made claims under their insurance contracts, which Defendants determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

73.     Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendants purported to pay Plaintiffs and each of the other Class members the ACV of their totaled vehicles.

74.     Defendants, however, failed to pay the ACV of Plaintiffs' and Class members' vehicles because Defendants applied an arbitrary and capricious "typical negotiation" adjustment— and, in some cases, ordered the adjustments solely based on disadvantaging insureds and advantaging Defendants—to comparable vehicles in order to reduce their market value and, as a result, Defendants' total-loss payments to insureds.

75.     Defendants also failed to comply with Missouri Law, which requires insurers to determine "fair market value" as "a. Set forth in a current edition of any nationally recognized compilation of retail values, including automated databases, or from publications commonly used by the automotive and insurance industries to establish the values of motor vehicles; b. Determined pursuant to a market survey of comparable vehicles with regard to condition and equipment; and c. Determined by an insurance company using any other procedure recognized by the insurance

industry, including market surveys, that is applied by the company in a uniform manner[.]" Missouri Revised Statutes 301.010(54).

76.     Thus, Defendants failed to pay Plaintiffs and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached their contract with Plaintiffs and each of the other Class members.

77.     As a result of such contractual breaches, Plaintiffs and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 5
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

78.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

79.     This Count is brought on behalf of the Missouri Class (for purposes of this Count, the "Class").

80.     Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

81.     Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

82.     Under the Policy, Defendants had discretion to perform their obligations under the contract, including the obligation to determine the ACV of an insured's total-loss vehicle. Defendants, however exercised their discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

83.     Defendants also failed to comply with Missouri Law, which requires insurers to determine "fair market value" as "a. Set forth in a current edition of any nationally recognized compilation of retail values, including automated databases, or from publications commonly used by the automotive and insurance industries to establish the values of motor vehicles; b. Determined pursuant to a market survey of comparable vehicles with regard to condition and equipment; and c. Determined by an insurance company using any other procedure recognized by the insurance industry, including market surveys, that is applied by the company in a uniform manner[.]" Missouri Revised Statutes 301.010(54).

84.     As such, Defendants breached the covenant of good faith and fair dealing by, *inter alia*:

   a. Intentionally applying "typical negotiation adjustments" to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

   b. Failing to pay insureds the ACV of their total-loss vehicles;

   c. Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total-loss claims;

   d. Inventing spurious grounds for undervaluing total-loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable

85.     Defendants' breaches of the covenant of good faith and fair dealing have caused damages to Plaintiffs and the Class. Plaintiffs' and the Class members' damages include the amounts improperly deducted by Defendants from their payments to insureds on the basis of a typical negotiation adjustment.

## COUNT 6
## DECLARATORY JUDGMENT

86.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

87.     This Count is brought on behalf of the Missouri Class (for purposes of this Count, the "Class").

88.     A dispute between Plaintiffs and the Class and Defendants is before this Court concerning the construction of the auto insurance policies issued by Defendants, and the rights of Plaintiffs and the Class arising under that policy.

89.     Plaintiffs, individually and on behalf of the Class, seek a declaration of rights and liabilities of the parties herein. Specifically, Plaintiffs seek a declaration that in paying total-loss claims by first-party insureds, it is a breach of Defendants' insurance contract, as well as a violation of law, for Defendants to base the valuation and payment of claims on values of comparable vehicles that have been reduced by arbitrary typical negotiation adjustments that are (a) arbitrary, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and (c) not as reasonably specific or appropriate as to dollar amount.

90.     Defendants' unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendants have breached, and continues to breach, the express terms of their contracts of insurance with Plaintiffs and members of the Class.

91.     As a result of these breaches of contract, Plaintiffs and the Class members have been injured.

**C.     Claims on Behalf of the Minnesota Class**

**COUNT 7**
**BREACH OF CONTRACT**

92.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

93.     This Count is brought on behalf of the Minnesota Class (for purposes of this Count, the "Class").

94.     Plaintiffs and each of the other Class members were insured under a policy issued by Defendants, as described herein.

95.     Plaintiffs and each of the other Class members made claims under their insurance contracts, which Defendants determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

96.     Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendants purported to pay Plaintiffs and each of the other Class members the ACV of their totaled vehicles.

97.     Defendants, however, failed to pay the ACV of Plaintiffs' and Class members' vehicles because Defendants applied an arbitrary and capricious "typical negotiation" adjustment to comparable vehicles in order to reduce their market value and, as a result, Defendants' total-loss payments to insureds.

98.     Defendants also failed to comply with Minnesota law, which requires insurance companies to determine the actual cost for cash settlements by "(i) the cost of a comparable automobile, adjusted for mileage, condition, and options, in the local market area of the insured, if

such an automobile is available in that area; or (ii) one of two or more quotations obtained from two or more qualified sources located within the local market area when a comparable automobile is not available in the local market area. The insured shall be provided the information contained in all quotations prior to settlement; or (iii) any settlement or offer of settlement which deviates from the procedure above must be documented and justified in detail. The basis for the settlement or offer of settlement must be explained to the insured." MINN. STAT. § 72A.201 Subd.6(b).

99.     Thus, Defendants failed to pay Plaintiffs and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached their contract with Plaintiffs and each of the other Class members.

100.    As a result of such contractual breaches, Plaintiffs and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 8
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

101.    Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

102.    This Count is brought on behalf of the Minnesota Class (for purposes of this Count, the "Class").

103.    Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

104.    Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one

of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

105.    Under the Policy, Defendants had discretion to perform their obligations under the contract, including the obligation to determine the ACV of an insured's total-loss vehicle. Defendants, however exercised their discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

106.    Defendants also failed to comply with Minnesota law, which requires insurance companies to determine the actual cost for cash settlements by "(i) the cost of a comparable automobile, adjusted for mileage, condition, and options, in the local market area of the insured, if such an automobile is available in that area; or (ii) one of two or more quotations obtained from two or more qualified sources located within the local market area when a comparable automobile is not available in the local market area. The insured shall be provided the information contained in all quotations prior to settlement; or (iii) any settlement or offer of settlement which deviates from the procedure above must be documented and justified in detail. The basis for the settlement or offer of settlement must be explained to the insured." MINN. STAT. § 72A.201 Subd.6(b).

107.    As such, Defendants breached the covenant of good faith and fair dealing by, *inter alia*:

      a.  Intentionally applying "typical negotiation" adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

      b.  Failing to pay insureds the ACV of their total-loss vehicles;

c.  Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total-loss claims;

d.  Inventing spurious grounds for undervaluing total-loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

108.  Defendants' breaches of the covenant of good faith and fair dealing have caused damages to Plaintiffs and the Class. Plaintiffs' and the Class members' damages include the amounts improperly deducted by Defendants from their payments to insureds on the basis of a typical negotiation adjustment.

## COUNT 9
## DECLARATORY JUDGMENT

109.  Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

110.  This Count is brought on behalf of the Minnesota Class (for purposes of this Count, the "Class").

111.  A dispute between Plaintiffs and the Class and Defendants is before this Court concerning the construction of the auto insurance policies issued by Defendants, and the rights of Plaintiffs and the Class arising under that policy.

112.  Plaintiffs, individually and on behalf of the Class, seek a declaration of rights and liabilities of the parties herein. Specifically, Plaintiffs seek a declaration that in paying total-loss claims by first-party insureds, it is a breach of Defendants' insurance contract, as well as a violation of law, for Defendants to base the valuation and payment of claims on values of comparable vehicles that have been reduced by arbitrary "typical negotiation" adjustments that are (a) arbitrary, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and (c) not as reasonably specific or appropriate as to dollar amount.

113.    Defendants' unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendants have breached, and continues to breach, the express terms of their contracts of insurance with Plaintiffs and members of the Class.

114.    As a result of these breaches of contract, Plaintiffs and the Class members have been injured.

**D.    Claims on Behalf of the Wisconsin Class**

**COUNT 10**
**BREACH OF CONTRACT**

115.    Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

116.    This Count is brought on behalf of the Wisconsin Class (for purposes of this Count, the "Class").

117.    Plaintiffs and each of the other Class members were insured under a policy issued by Defendants, as described herein.

118.    Plaintiffs and each of the other Class members made claims under their insurance contracts, which Defendants determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

119.    Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendants purported to pay Plaintiffs and each of the other Class members the ACV of their totaled vehicles.

120.    Defendants, however, failed to pay the ACV of Plaintiffs' and Class members' vehicles because Defendants applied an arbitrary and capricious "typical negotiation" adjustment to comparable vehicles in order to reduce their market value and, as a result, Defendants' total-loss payments to insureds.

121.     Thus, Defendants failed to pay Plaintiffs and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached their contract with Plaintiffs and each of the other Class members.

122.     As a result of such contractual breaches, Plaintiffs and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 11
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

123.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

124.     This Count is brought on behalf of the Wisconsin Class (for purposes of this Count, the "Class").

125.     Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

126.     Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

127.     Under the Policy, Defendants had discretion to perform their obligations under the contract, including the obligation to determine the ACV of an insured's total-loss vehicle. Defendants, however exercised their discretion unreasonably, with an improper motive, and in a

manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

128.     As such, Defendants breached the covenant of good faith and fair dealing by, *inter alia*:

   a. Intentionally applying "typical negotiation" adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

   b. Failing to pay insureds the ACV of their total-loss vehicles;

   c. Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total-loss claims;

   d. Inventing spurious grounds for undervaluing total-loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

129.     Defendants' breaches of the covenant of good faith and fair dealing have caused damages to Plaintiffs and the Class. Plaintiffs' and the Class members' damages include the amounts improperly deducted by Defendants from their payments to insureds on the basis of a typical negotiation adjustment.

## COUNT 12
## DECLARATORY JUDGMENT

130.     Plaintiffs repeat and re-allege all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

131.     This Count is brought on behalf of the Wisconsin Class (for purposes of this Count, the "Class").

132.    A dispute between Plaintiffs and the Class and Defendants is before this Court concerning the construction of the auto insurance policies issued by Defendants, and the rights of Plaintiffs and the Class arising under that policy.

133.    Plaintiffs, individually and on behalf of the Class, seek a declaration of rights and liabilities of the parties herein. Specifically, Plaintiffs seek a declaration that in paying total loss claims by first-party insureds, it is a breach of Defendants' insurance contract, as well as a violation of law, for Defendants to base the valuation and payment of claims on values of comparable vehicles that have been reduced by arbitrary "typical negotiation" adjustments that are (a) arbitrary, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and (c) not as reasonably specific or appropriate as to dollar amount.

134.    Defendants' unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendants have breached, and continues to breach, the express terms of their contracts of insurance with Plaintiffs and members of the Class.

135.    As a result of these breaches of contract, Plaintiffs and the Class members have been injured.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully seek judgement in Plaintiffs' favor and in favor of the Class as follows:

A.    An Order certifying this action as a Class Action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    An award of damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiffs and the Class in an amount to be

determined at trial, plus interest, in accordance with law;

C.   Appropriate preliminary and/or final injunctive or equitable relief against the conduct of Defendants' described herein;

D.   An award Plaintiffs' and the Class' costs of suit, including reasonable attorneys' fees as provided by law; and

E.   An award of such further and additional relief as is necessary to redress the harm caused by Defendants' unlawful conduct and as the Court may deem just and proper under the circumstances.

Dated: July 15, 2022.                      Respectfully submitted,

**SHAMIS & GENTILE, P.A.**
*/s/ Andrew J. Shamis*
Andrew J. Shamis, Esq.
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq.
Florida Bar No. 0100537
Chris Gold, Esq.
Florida Bar No. 088733
scott@edelsberglaw.com
chris@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471
Direct: (305) 975-3320
Fax: (786) 623-0915

***Counsel for Plaintiffs and the Proposed Class***