**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SABRINA TIMMINS, HOLLY JOHNSON, ELAINE SCHERER, and TONIA HOBBS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>AMERICAN FAMILY INSURANCE COMPANY and AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., Wisconsin corporations,<br><br>    Defendants. | Case No. 3:22-cv-00214<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND INCORPORATED MEMORANDUM OF LAW**

1

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

I.   RELEVANT FACTUAL BACKGROUND ...........................................................5

   A.   **American Family's Use of Audatex Reports to Appraise Class Members' Totaled Vehicles**...........................................................................................................5

   B.   **The Typical Negotiation Deduction is Rigged against the Insured and Must be Removed from the Audatex Appraisals to Arrive at a Sound Valuation of ACV** ...............7

II.   ARGUMENT ...........................................................................................................11

   A.   **The Class is Ascertainable** ...............................................................................12

   B.   **Common Issues Predominate** ..........................................................................15

     1.   Courts consistently find that common issues predominate in cases where insureds present common proof that a discrete element of the ACV calculation constitutes a breach of contract ................................................................................................................16

     2.   The elements of the breach of contract claims are subject to common proof that predominate over individual questions................................................................17

     3.   The elements of the claims for breach of the covenant of good faith and fair dealing are subject to common proof that predominates over individualized questions ........................21

     4.   Plaintiffs' damages model fits the theory of liability, and any individual issues of damages cannot predominate over common issues of liability ................................22

   C.   **The Remaining Rule 23(a) Prerequisites Are Met** ........................................28

     1.   The Classes are numerous such that joinder is impracticable ...........................28

     2.   Plaintiffs are typical of, and will adequately represent, the Classes ................28

   D.   **Class Treatment is Superior** ............................................................................30

   E.   **Additionally, Class Treatment is Proper Under Rule 23(c)(4) and Rule 23(B)(2)** ......32

CONCLUSION ................................................................................................................34

Plaintiffs Sabrina Timmins, Holly Johnson, Elaine Scherer, and Tonia Hobbs, hereby move, pursuant to Federal Rules of Civil Procedure 23, for an order certifying Wisconsin, Missouri, and Kansas classes, appointing Plaintiffs as class representatives, and appointing Andrew J. Shamis of Shamis & Gentile, P.A., Adam A. Schwartzbaum and Scott Edelsberg of Edelsberg Law, and Jacob L. Phillips and Edmund A. Normand of Normand PLLC, as class counsel.

## INTRODUCTION

If an insured vehicle sustains a total loss, Defendants American Family Insurance Company and American Family Mutual Insurance Company, S.I. (together, "American Family" or "Defendants") are obligated under their insurance policy to pay the vehicle's actual cash value ("ACV"). American Family does not. Instead, using appraisals conducted by a third-party vendor, Audatex, American Family systemically thumbs the scale by applying baseless "typical" negotiation deductions ("TNDs") that reduce insureds' claims payments below ACV. The TNDs have no reasonable basis and, shockingly, are based on statistical analyses ███████████ ████████████████████████████████████████████████████. American Family's uniform conduct constitutes a breach of its contractual obligations to its insureds that is eminently suitable for class treatment.

The Internet changed the used-car industry. Because consumers now have the ability to comparison shop online, used-car dealers, to remain competitive in the modern market, utilize sophisticated pricing and inventory management tools to appraise vehicles and price them to market. Because cars are priced to market and listed at that market price, there is little negotiation over the cash market price. Any variance between the listed and sold price of a vehicle typically reflects other components of the transaction—such as trade-in vehicles, dealership financing, or

special discounts (employee, military, friends/family)—that cause the reported sold price to be higher or lower than the advertised price but are unrelated to the *actual* market price in a cash transaction. For these reasons, used vehicles are usually sold for their advertised cash price.

American Family knows this is true. Indeed, an honest statistical analysis of the data confirms that used vehicles ███████████████████████████████████████████ ████████████████████████████ By far the ███████████████████████████ █████████████████████████████████████ Incredibly, the █████████ ████████████████████████████████████████ ███. In other words, the data conclusively proves that ██████████████████, under any definition of "typical."

So, how does American Family attempt to justify applying so-called "typical" negotiation deductions to Class Members' appraisals in the amount of (on average) ████?[1] ████████████ Remarkably, when calculating TNDs, American Family and Audatex first ████████████████ ████████████████████████████████████. Then, for the remaining minority ███████████████, they assume, ██████████████████████ ████████████████████████████████████████████, rather than for far more likely reasons discussed below. Indeed, they credulously accept that consumers negotiated up to a whopping ███████████████████████████████████████████ ██████.

This is folly. As Plaintiff's industry expert, Kirk Felix, explains, there are numerous components of used-car transactions that are irrelevant to the vehicle's actual ***cash*** value but can

---

[1] A 7% TND reflects that according to American Family, the typical sold-to-list ratio is 0.93. That's not even close.

cause a vehicle's sold price to be reported as higher or lower than its advertised price. These include, for example, where a dealership nominally lowered the price of the vehicle because it was making up the difference, or more, through points on financing; because the consumer had a trade-in that incentivized the dealer to sell at a below-market price (which, of course, no Class Member would have); or because the consumer was entitled to a generally unavailable discount, such as employee, military, or loyalty. ███████████████████████████████, American Family is not measuring cash price negotiations at all, much less "typical" ones.

These market realities explain why appraisers using the comparable (or "comp") methodology to determine a vehicle's ACV do not apply the rigged TND. As Plaintiff's appraisal expert, Jason Merritt, explains, a vehicle's ACV is calculated by taking the average price of comparable vehicles—vehicles of the same year, make, and model as the insured vehicle—adjusted for *verified* differences in mileage, equipment, and the pre-accident condition of the insured vehicle. It is improper to adjust based on unverified assumptions, let alone make an adjustment that conflicts with the very data on which it is purportedly based.

Once the line-item TNDs are removed, however, the Audatex Reports generated by American Family to calculate the ACV of each Class Members' vehicle properly follow this comp methodology. Merritt explains that, without the TND, the Audatex Reports document a reliable and sound individualized appraisal of each loss vehicle following the standard comp methodology. Thus, there is a straightforward methodology for recalculating the ACV of each class members' total loss vehicle: Audatex has already identified comparable vehicles, already verified and identified differences in mileage, condition, and equipment, and already made downward and upward adjustments based on those differences (if any); and all parties agree that those steps in the process were valid and proper. Once the TND is removed from the vehicle's base value, these

valid adjustments can be reapplied to reach each car's proper ACV. In short, this case is simple: the problem is American Family's thumbing of the scales, and the remedy is to stop thumbing the scales, *i.e.*, remove the TND line-item adjustment from the Audatex valuation.

Importantly, courts routinely certify for class treatment cases challenging line-item deductions in multi-step appraisals, including in a case against Progressive challenging so-called "Projected Sold Adjustments" (which is just another name for the TNDs) that, like the TNDs, rely on rigged data to reduce the advertised price of comparable vehicles and, in turn, the ACV of insureds' totaled vehicles. *See, e.g.*, *Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243 (LGS), 2023 WL 2532836 (S.D.N.Y. March 16, 2023), *petition for leave to appeal denied*, No. 23-472 (2d Cir. May 31, 2023).

In short, the TND is bunk. And American Family's *own data* confirms it is bunk. Class treatment will ensure that, after Plaintiffs prove their case and that line-item adjustment is removed, insureds will receive the ACV of their vehicles to which they are entitled and paid premiums to receive. Plaintiffs, therefore, move the Court to certify the following Classes:

> **The Wisconsin Class.** All Wisconsin citizens insured by American Family Insurance Company who made a first-party claim on a policy of insurance issued by American Family Insurance Company to a Wisconsin resident where, from April 13, 2017 through the date an order granting class certification is entered, American Family Insurance Company determined that the vehicle was a total loss and based its claim payment on an appraisal report from Audatex where a typical negotiation deduction ("TND") was applied to at least one comparable vehicle.

> **The Kansas Class.** All Kansas citizens insured by American Family Mutual Insurance Company, S.I. who made a first-party claim on a policy of insurance issued by American Family Mutual Insurance Company, S.I. to a Kansas resident where, from April 13, 2017 through the date an order granting class certification is entered, American Family Mutual Insurance Company, S.I. determined that the vehicle was a total loss and based its claim payment on an appraisal report from Audatex where a typical negotiation deduction ("TND") was applied to at least one comparable vehicle.

4

**The Missouri Class.** All Missouri citizens insured by Defendants who made a first-party claim on a policy of insurance issued by American Family Insurance Company to a Missouri resident where, from April 13, 2012 through the date an order granting class certification is entered, American Family Insurance Company determined that the vehicle was a total loss and based its claim payment on an appraisal report from Audatex where a typical negotiation deduction ("TND") was applied to at least one comparable vehicle.

## I.     RELEVANT FACTUAL BACKGROUND

### A.  American Family's Use of Audatex Reports to Appraise Class Members' Totaled Vehicles

American Family uses form insurance policies with materially identical language. Ex. 2 ("Felt Dep.") at 35:21–66:20. In the "Car Damage Coverages" section of its form policy, American Family promised to pay for "loss" to covered autos. Ex. 4 (Specimen Policy) at 5; *see also* ECF No. 88-1 (Plaintiffs' policies). When an insured suffers a loss, American Family can choose to repair the loss vehicle or to pay its "actual cash value." *Id.* at 6–7. Plaintiffs and Class members experienced what American Family determined to be a total loss, meaning ███████

████████████████████████████████████████████████████████████████████████

██████. Felt Dep. at 168:25–183:25. Until American Family switched appraisal vendors in April 2020, American Family used Audatex to appraise its insureds' totaled vehicles. *Id.* at 67:1–72:17. American Family's new vendor, CCC, does not use a TND as part of its valuation process for total loss vehicles. *Id.* at 76:9–16; 161:12–23.

Each of the four Plaintiffs were in an accident or had their vehicle stolen and American Family declared their vehicles to be a total loss. Audatex conducted an individualized appraisal of the Plaintiffs' vehicles using the default comp methodology. The comp methodology ██████

████████████████████████████████████████████████████████████████████████

████████████████████████████████. Ex. 3 ("Lowell Dep.") at 55:4–15; Felt Dep.

at 125:4–16, 128:17–24; Ex. 11 (Autosource Compsum Valuation Methodology) at 2–5[2]; *see also, e.g.,* Ex. 7 at 1–3. The advertised price of each comparable vehicle is then ███████████ █████████████████████████████████████████████████████████████████████████████ ████████████████, which constitutes the "base" market value.[3] Ex. 11 at 7–9; *see also, e.g.,* Ex. 7 at 1–3. The average of these adjusted prices is then adjusted—███████████████ ████████████████████████████████████████████████████████, which then constitutes the "adjusted" (or final) market value. Ex. 11 at 7–9; *see also, e.g.,* Ex. 7 at 1–3. As Plaintiffs' appraisal expert, Jason Merritt, explains, the price after making these adjustments for observed and verified characteristics of the loss and comparable vehicles is the ACV of the totaled vehicle based on a sound comp methodology. Ex. 5 ("Merritt Rep.") at 2–8.

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████. Lowell Dep. at 187:7–188:8; Felt Dep. at 125:4–131:6. They further represent to each insured that the Audatex appraisal was "prepared specifically for your vehicle and represents a fair and accurate value driven by the retail used vehicle market." Exs. 7, 8, 9, & 10 (Plaintiffs' Audatex Market-Driven Valuation Reports) at 1. If the process as described above were a complete description of American Family's valuation, this case would not exist. But it is not a complete description. Instead, American Family first applies the spurious, capricious, and false TND to the list price of comparable vehicles. The sole

---

[2] Mr. Lowell confirmed that this document accurately summarized Audatex's methodology. Lowell Dep. at 216:8–217:7.

[3] For example, if a comparable vehicle has less mileage than the totaled vehicle, the price will be adjusted downward, because all else being equal, vehicles with less mileage are worth more—and if a comparable vehicle has more mileage than the totaled vehicle, the price will be adjusted upward.

point of dispute is American Family practice of first applying TNDs to reduce the advertised price

of the comps before making the observed and verified adjustments.

**B. The Typical Negotiation Deduction is Rigged against the Insured and Must be Removed from the Audatex Appraisals to Arrive at a Sound Valuation of ACV**

The TND is derived ███████████████ to support American Family's foregone conclusion

that consumers typically negotiate discounts off the Internet price of used vehicles in cash

transactions.[4] ████████████████████████████████████████████████████



██████████████████████████████. Lowell Dep. at 105:8–107:21. ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████Lowell Dep. at 124:24–130:22. █████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

Bu here's the rub: incredibly, before calculating the TND percentage to apply, Audatex

first ████████████████████████████████████████████████████████████

███. Lowell Dep. at 178:20–180:24; Felt Dep. at 140:9–12. When considering *all* transactions

rather than filtering out the ones American Family didn't like, the transactional data proves that

vehicles typically sell for list price—the mode and median sold-to-list ratio is 1.0. Braun Rep. (Ex.

---

[4] Like Mr. Felix, Plaintiffs are using "cash" transaction from the perspective of the dealership. So, "cash" transactions would include transactions where the purchaser is not financing and would also include transactions where the purchaser secures their own financing outside the dealership.

1) at ¶¶ 36-37.[5] This bears repeating: the median and mode sold-to-list 

Of course, even for those remaining transactions where a vehicle's reported sale price is less than list price, Plaintiffs' industry expert, Kirk Felix, explains it cannot be assumed that a difference between a vehicle's list price and sold price is attributable to negotiation over the market price in a cash transaction. *See* Ex. 6 ("Felix Report). This is because many variables in used-car transactions are unrelated to a vehicle's actual *cash* value, yet may affect how a deal is structured and result in a sold price being reported *higher or lower* than list price. *Id.* at 6–10. These include (1) where dealerships finance the vehicle and shift profit to points on the loan; (2) the customer is entitled to a special discount (military, employee, etc.); (3) the purchaser had a trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle (which of course no Class Member would have); or (4) the seller was motivated to sell below

---

[5] In parallel cases, ███████████████████

████████████████████ In reviewing the data in this case, however, Dr. Braun identified that Audatex only provided data that was used to calculate the TND—in other words, ████

████████████. The undersigned already have access to Audatex's full data because it was produced in other cases. But, for unknown reasons, Audatex objected to Dr. Braun reviewing that data until it is re-produced in this case. So, Plaintiffs secured the state DMV's vehicle sale data, ███████████████████, which Dr. Braun shows confirms that vehicles typically sell for list price. And once Audatex's data is re-produced in this case (the complete data set has been subpoenaed), Dr. Braun will supplement his Report and confirm that ████████████████████

market price because it would make significant additional profits on the sale of ancillary products, such as warranties, service contracts, or key insurance. *Id*. at 6–8. Dr. Braun testifies ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Braun Rep. ¶¶ 47–52.

Felix's opinion is supported by the lived experiences of the Plaintiffs. Consider Tonia Hobbs, a Plaintiff who has purchased two used cars for less than their list price. As she testified at her deposition, Ms. Hobbs only received these discounts because she chose dealer financing that resulted in much higher overall prices for the vehicles when accounting for loan interest.[6] To wit, in September 2014, Ms. Hobbs received a $5,699 discount off the list price of a 2013 Toyota Corolla. *See* Ex. 14 (Hobbs 000015). Importantly, this discount had nothing to do with Ms. Hobbs' negotiating skills. Instead, the dealership only gave a discount because it was a "Finance Transaction," *id.*, based on a 72-month financing agreement at a **22.01%** A.P.R. *See* Ex. 15 (Hobbs 000012). The $5,699 discount Ms. Hobbs received was eclipsed by the *over $12,000* in interest payments she committed to pay over the life of the loan. According to American Family, however, ███████████████████████████████████████████. This is clearly unreasonable.

Despite these well-known market realities, and ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████. Lowell Dep. at 160:9–164:24. Moreover, American Family and Audatex made this assumption even though they have ████████████ ████████████████████████████████████████████████████████████████

---

[6] At the time of filing, Ms. Hobbs's deposition transcript was not yet available. Plaintiffs will supplement the record once they receive the transcript.

██████████████████████████████████████████████. Felt Dep. at 143:8–151:16;

155:9–160:17; 201:23–203:10; Lowell Dep. at 105:8–111:24. In short, a reported sale amount

might be less (or more) than the advertised amount for reasons that are usually not related to the

vehicle's actual market price, yet American Family, to the detriment of its insureds, assumed that

it *always is*.

Once the typical negotiation deduction is removed, however, the Audatex appraisal reports

document a sound and reliable appraisal of ACV following the comp methodology. Under the

comp methodology, appraisers average the list prices of comparable vehicles to calculate a "base

value" and then make line-item price adjustments based on documented and observed differences

between the comparable vehicle(s) and the insured vehicle in options, mileage, trim/equipment,

and condition. Merritt Report at 2–4. Any line-item price adjustment must be based on observed,

documented, and verifiable information. *Id*. Other than the TND, Audatex's methodology is

consistent with this standard. Audatex has already identified comparable vehicles, adjusted for

differences in milage and equipment, and adjusted based on the condition of the insured vehicles,

and, crucially, Plaintiffs do not challenge any of those actions taken by Audatex. As such, each

Class Members' damages can be determined by backing out the TND to calculate a new vehicle

base amount and then applying the adjustments Audatex made for mileage, options, and condition[7]

to find a new market value.[8] Merritt Report at 7–10; Braun Rep. ¶¶ 55–62. ███████████████

████████████████████████████████, Felt Dep. at 89:12–16; Audatex maintains

---

[7] Based on Audatex's methodology, when the TND is removed, the condition adjustment is increased it at the same rate as the TND, which either means damages may be slightly higher (if the condition adjustment was positive) or slightly lower (if it was negative) than the TND amount.

[8] In Kansas, the amount added to ACV upon removal of the TNDs will be commensurately increased by sales tax of 6.50%. In all states, the same deductibles will then be applied. *See* Ex. 12 (letters declaring total losses for Plaintiffs).

electronic data, including the TND amount, Lowell Dep. at 50:20–80:22; and, thus, damages can be identified and calculated on a classwide basis. Braun Rep. ¶¶ 55–62.

Consider the import of this overwhelming evidence. The empirical evidence conclusively shows American Family's theory that consumers "typically" negotiate down the listed price of autos in cash transactions is false, ███████████████████. For the remaining transactions, American Family made no effort to identify whether the difference was because of cash negotiations or instead due to reasons unrelated to actual cash market value. Instead, it made assumptions that result in the worst possible outcome for insureds: most vehicle transactions are somehow also outliers and can be ignored, and *every single dollar* chopped off a listed price up to 25% must be attributable to cash negotiations. Moreover, if American Family had bothered to ask, industry experts could have explained that its thesis was flatly wrong. But American Family was not looking for answers—it was looking for any pretext, however meritless, that would allow it to fill its own pockets at the expense of its insureds.

As set forth below, the claims arising from American Family's actions are eminently suitable for class treatment.  Plaintiffs' claims are based on (1) identical form contract language and (2) practices that applied uniformly across the Class. Plaintiffs' theory is that the TND deduction can never be applied under the Policy, while American Family's is that it can always be applied. Whether a jury agrees with Plaintiffs or American Family, resolution of that question will resolve virtually the entirety of Class members' claims in a single stroke. Thus, this Court should grant class certification.

## II.    ARGUMENT

To certify a class, a plaintiff must satisfy all four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one part of Rule 23(b). *Vandehey v. Client*

*Servs.*, 390 F. Supp. 3d 956, 959 (E.D. Wis. 2019). A class is maintainable under Rule 23(b)(3) if common questions predominate over individual questions and if class treatment is superior to alternative available methods of adjudication. Fed. R. Civ. P. 23(b)(3). A class is maintainable under Rule 23(b)(2) where a defendant has acted on grounds "generally applicable to the class," thereby making declaratory relief appropriate. Fed. R. Civ. P. 23(b)(2).

Although the certification analysis may overlap with the merits of the underlying claim, courts should not "engage in free-ranging merits inquiries at the certification stage." *See Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 (8th Cir. 2018). Instead, "'[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Id*. (quoting *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013)). In other words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Ramirez v. GLK Foods, LLC*, No. 12-C-210, 2014 U.S. Dist. LEXIS 80073, at *8 (E.D. Wis. June 10, 2014).

District courts have broad discretion in deciding whether to certify a class*. See Reliable Money Order, Inc. v. McKnight Sales Co*., *Inc*., 281 F.R.D. 327, 332 (E.D. Wis. 2012). But if a named plaintiff demonstrates the Rule 23 requirements are met, the discretion disappears—Rule 23 "creates a categorical rule entitling a plaintiff" who satisfies the Rule's elements "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010). Finally, "in close cases courts should err in favor of certification because the class can be modified as the case progresses." *Tinsley v. Covenant Care Servs., LLC*, No. 1:14CV00026, 2016 U.S. Dist. LEXIS 11988, at *6 (E.D. Mo. Feb. 2, 2016).

## A.  THE CLASS IS ASCERTAINABLE

An implicit requirement for certification under Rule 23(b) is the proposed class must be ascertainable. *Mullins v. Direct Dig., Ltd. Liab. Co*., 795 F.3d 654, 657 (7th Cir. 2015). The

Seventh Circuit has held that ascertainability is satisfied by "defining classes clearly and with objective criteria." *Id*. at 672. This standard is met here.

In the Seventh Circuit, ascertainability addresses "the adequacy of the class definition," not whether "it would be difficult to identify particular members of the class." *Id.* at 659. The court identified three types of class definitions that can fail the ascertainability test: vagueness, subjectivity, and failsafe classes, none of which apply here. The proposed Classes are based on specific, tangible facts, and, thus, are not vague or imprecise. Second, the parties and the Court can determine if someone is a Class member based on objective, identifiable criteria in the electronic claims data and documentation maintained by American Family. Every criterion for membership—insured by American Family, date of loss, whether it was a covered total-loss claim, whether it was based on an Audatex Report, and whether a TND was applied—is objective, not subjective criteria such as state of mind. *See id*. at 660 ("Plaintiffs can generally avoid the subjectivity problem by defining the class in terms of conduct (an objective fact) rather than a state of mind.").[9] Finally, the proposed Classes are not failsafe classes—meaning class membership does not turn on whether the insured wins or loses on the merits. *See id.* (explaining that failsafe classes "are defined in terms of success on the merits").

---

[9] The Class is defined with reference to objective criteria, not subjective criteria such as state of mind. *See Angell v. GEICO Advantage Ins. Co.*, No. 4:20-cv-0799, 2021 U.S. Dist. LEXIS 228743, at *4, 9 (S.D. Tex. Nov. 30, 2021) (whether insureds submitted an auto claim determined to be a covered total-loss during a given period is all objective criterion); *Alexander v. Price*, 275 F. Supp. 3d 313, 327 (D. Conn. 2017) (the date on which an event occurred is objective criteria); *Mitchell v. State Farm Fire & Cas. Co.*, 327 F.R.D. 552, 560 (N.D. Miss. 2018) (whether an individual was the defendant's insured is objective criteria); *Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 73 (S.D.N.Y. 2022) (finding plaintiff satisfied ascertainability requirement because class was "defined by location, subject matter, and time, and these boundaries are sufficient to prevent the need for a "mini-hearing on the merits" to determine if any given person is a class member," and plaintiff could "identify putative class members via data stored in Defendant's management software.").

Because ascertainability is concerned with the class definition and not "the difficulty of identifying" class members, *id*. at 659, courts in the Seventh Circuit have explained that ascertainability is not defeated simply because a manual review of individual claims files may be necessary. *Moreno v. Napolitano*, No. 11 C 5452, 2014 U.S. Dist. LEXIS 138576, at *21–22 (N.D. Ill. Sep. 30, 2014) ("[T]he Court finds that Plaintiffs have identified an ascertainable class, and the fact that Defendants may need to conduct a manual review to determine the composition of the class is not sufficient grounds for denying class certification."); *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir. 2012) ("Plaintiffs' classes are defined by classic categories of objective criteria . . . the need to manually review files is not dispositive. If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained."). Here, identification of Class members can be made based solely on American Family's own records— and even if it requires in some instances looking at individual Audatex Reports, this does not preclude certification. *Id*.; *see also Wiles v. Locatplus Holdings Corp*., No. 09-04164-CV-C-NKL, 2010 U.S. Dist. LEXIS 77494 (E.D. Mo. Aug. 2, 2010) (finding that because membership could be obtained "by means of objective electronic and record searches," the class definition was adequate).

American Family may attempt to contest ascertainability by arguing it did not retain a *data point* for the TND amount. ███████████████████████████████████ ███████████████████████████████. Lowell Dep. at 50:20–80:22; Braun Rep., ¶¶ 54-57. Moreover, American Family ███████████████████████████████ ███████████████████████████████████████████. *Id*. Therefore, even if the overarching data were insufficient to identify Class members, there is no question the

14

underlying claim files will. As such, it is administratively feasible to determine whether a given individual is a member of the Class. *See Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015) ("The individualized fact-finding giving rise to mini-trials that defeat ascertainability are those requiring determinations on the merits — not an administrative review to determine whether an objective element of a class definition is met"); *Young*, 693 F.3d at 537–538 ("[T]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification").

In short, the Court should find the Classes are ascertainable because Class members can be identified by reference to objective criteria and doing so will be administratively feasible.

## B. COMMON ISSUES PREDOMINATE

Under Rule 23(a)(2), there must be questions common to the class, meaning there is at least one question the answer to which "will resolve an issue that is central to the validity of [each claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "'[T]he issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.'" *Barden v. Hurd Millwork Co*., 249 F.R.D. 316, 320 (E.D. Wis. 2008) (internal quotations omitted). "Thus, the primary consideration in assessing predominance is the proof necessary to establish the class members' claims under the applicable substantive law." *Id*. Issues which satisfy the predominance inquiry are those where absent class members could rely on the same evidence as the named plaintiffs in making a prima facie case were they to bring an individual action or where there is a central issue susceptible to class-wide proof. *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (citing 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)). Importantly, "[i]t is well established that the presence of individualized questions regarding

damages *does **not** prevent certification* under Rule 23(b)(3)." *Messner v. Northshore Univ.*

*HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (emphasis added).

1.   **Courts consistently find that common issues predominate in cases where insureds present common proof that a discrete element of the ACV calculation constitutes a breach of contract.**

Where insureds proffer common proof that a discrete portion or element of an ACV

calculation is illegitimate and constitutes a breach of contract, courts consistently find that class

treatment is appropriate—including, most notably, in the *Volino* case, which certified classes based

on claims materially *identical* to the claims here. 2023 WL 2532836, at *8 (finding, where

plaintiffs challenged a "negotiation" adjustment to the list price of comparable vehicles, that the

"critical common questions identified by Plaintiffs predominate over those individual inquiries").

District courts across the country have certified similar class actions,[10] and circuit courts of appeal

have repeatedly affirmed such class certification orders.[11]

---

[10] *See Sampson v. United Servs. Auto. Ass'n*, No. 6:19-cv-896, 2022 WL 1415652, at *8 (W.D. La. May 3, 2022) (concluding common issues predominated where insureds challenged base value calculation of totaled vehicles); *Shields*, 2022 WL 37347, at *7–8 (same);  *Lewis v. Gov't Employees Ins. Co.*, 2022 WL 819611, at *8 (D.N.J. March 18, 2022) (finding whether GEICO's application of a discrete adjustment constituted a breach and whether failure to include sales tax in ACV were common, predominating issues); *Angell v. GEICO*, 2021 U.S. Dist. LEXIS 228743 (S.D. Tex. Nov. 30, 2021) (finding common issues predominated where plaintiffs claimed insurer underpaid ACV by not including line-items for sales tax and title fees); *Paris v. Progressive Am. Ins. Co.*, No. 19-21761-CIV, 2020 U.S. Dist. LEXIS 212127 at *18 (S.D. Fla. Nov. 13, 2020) (concluding the questions of "whether the policy language requires Progressive to pay sales tax and transfer fees as part of the ACV of a vehicle are common to all class members") (cleaned up); *Sos v. State Farm Mut. Auto. Ins. Co.*, No: 6:17-cv-890-Orl-40LRH, 2019 U.S. Dist. LEXIS 139680, at *10 (M.D. Fla. May 2, 2019) (same); *Slade v. Progressive Sec. Ins. Co.*, 2014 U.S. Dist. LEXIS 154713 (W.D. La. Oct. 30, 2014), *rev'd on other grounds,* 856 F.3d 408 (5th Cir. 2017) (concluding common issues predominated where insureds challenged base value calculation of totaled vehicles).

[11] *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 459 (6th Cir. 2020) (finding the common question of "whether State Farm breached Plaintiffs' standard-form contracts by deducting labor depreciation from their ACV payments" predominated over individualized issues); *Mitchell v. State Farm*, 954 F.3d 700, 710–712 (5th Cir. 2020) (finding whether insurance company breached

This case is no different. As set forth below, Plaintiffs can present common proof that application of the TNDs constitutes a breach of contract. As such, like in all these cases (and others) challenging a discrete element of the ACV calculation through common proof, common issues predominate.

### 2. The elements of the breach of contract claims are subject to common proof that predominate over individual questions.

Commonality is satisfied because whether Defendant's application of the TND to comparable vehicles' listed prices constitutes a breach of the form Policy is subject to common proof, and thus its answer will apply equally to all Class members. Whether a breach occurred turns on two key questions, both of which are subject to common evidence: (1) whether under the standard appraisal "comp" method, it is appropriate to use the list prices, without applying a TND, of comparable vehicles as the starting point in calculating the ACV of a vehicle, and (2) whether the TND is baseless and invalid, considering ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████, and evidence of how the used auto market actually operates. Moreover, all Class members were subject to the same Policy language and business practices.[12]

---

contract by depreciating labor as part of ACV calculation predominated over any individual questions pertaining to other portions of the ACV calculation); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) (affirming class certification, noting that the "only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified.").

[12] That class treatment is eminently appropriate here is unsurprising given the uniform representations in the form contract. As numerous courts have observed, it is breach of form contract claims that are "particularly well suited for class treatment." *Boswell v. Panera Bread Company*, 311 F.R.D. 515, 528 (E.D. Mo. 2015); *see also, e.g.*, *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 42 (1st Cir. 2003) (finding that "common issues of law and fact predominate"

The central question is whether application of the TND means, as Plaintiffs allege, Defendants are not calculating ACV as contractually required but are, instead, calculating an artificially reduced amount based on a manipulated and truncated "market." *See Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980–81 (8th Cir. 2021) (holding that if the plaintiff's allegations that the negotiation reduction is "contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value)" are true, then the insurance company "did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty[.]"). This issue at the crux of this case will resolve the dispositive issue in every Class member's claim, satisfying the commonality requirement. And because absent class members could rely on that same evidence—that American Family is failing to calculate ACV based on market value by excluding and manipulating the data, that car dealerships price to market, and that ACV can be calculated through the Audatex Report without the TNDs—to establish a prima facie case were they to bring an individual action, such evidence is clearly common to the Class. *See Tyson Foods*, 577 U.S. at 455.

These common issues predominate over any individual issues. Generally, the predominance analysis requires looking to the elements of the claim and predicting which will be proved through common proof versus which can only be proved through individualized proof. *See In re Suboxone (Buprenorphine Hydrochloride and Naxalone) Antitrust Litig.*, 421 F. Supp. 3d 12,

---

where the claims "turn[] on interpretation of the form contract, executed by all class members and defendant").

52 (E.D. Pa. 2019). Under Kansas, Wisconsin, and Missouri law, a claim for breach of contract requires evidence of the existence of the contract, its breach, and damages.[13]

The contract element is indisputably subject to common proof, as American Family identified every total-loss insured covered by its materially similar policies during the relevant time-period.

The breach element is also subject to common proof. First, the relevant duty—payment of ACV—is established by common proof, namely the form Policy language. Second, calculation of the ACV of Class Members' vehicles is subject to common proof, namely Mr. Merritt's testimony that the (common) methodology for calculating ACV is based on the average list prices[14] of comparable vehicles, accounting for differences in equipment and mileage and adjusted for the condition of the insured vehicle; in other words, Mr. Merritt's testimony that Audatex itself is the methodology for calculating ACV, setting aside the TNDs. Audatex has already identified the list prices of comparable vehicles, already adjusted such prices based on differences, if any, in equipment and mileage, and already adjusted for the condition of the insured vehicle. Thus, not only can Plaintiffs establish a method for calculating ACV based on common proof, they can apply that method and identify the ACV amount of every Class Members' vehicle based on American

---

[13] *N. Am. Mech., Inc. v. Walsh Constr. Co. II, LLC,* 132 F. Supp. 3d 1064, 1071 (E.D. Wis. 2015) (stating that, under Wisconsin law, elements of breach of contract require evidence of an enforceable contract, a breach, and damages resulting from that breach)*; DeHaemers v. DeHaemers*, 371 P.3d 374 (Kan. Ct. App. 2017) (same); *Newell Rubbermaid, Inc. v. Efficient Solutions, Inc.*, 252 S.W.3d 164, 176 (Mo. Ct. App. 2007) (same); *see also Klay v. Humana, Inc*., 382 F.3d 1241, 1263 (11th Cir. 2004) ("[a] breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey").

[14] Mr. Merritt also explained that actual sale prices can be used so long as they are verified and confirmed that other, irrelevant variables did not impact the sale amount—consistent with the requirement that any adjustments be based on verified, documented information. Audatex very occasionally uses sale prices rather than list prices of comparable vehicles, which Plaintiffs do not challenge.

Family's records alone. Moreover, Plaintiffs can buttress this testimony with common proof, such as Mr. Braun's statistical analysis showing that the ████████████████████ consistent with Mr. Felix's testimony that in the modern used auto market, dealerships price vehicles to market, both of which support the appropriateness of using list prices as the starting point for calculating ACV and demonstrate that the TND is baseless, capricious, and wrong. Finally, there is no question American Family paid less than this amount due to its application of the TNDs. As such, if the jury credits this testimony, the breach element will be established through common proof.

A court analyzing materially identical claims easily found that common issues predominated and that class treatment was appropriate. In *Volino*, like here, the insurer calculated ACV by taking the average price of comparable vehicles, adjusted for documented differences in options, mileage, and equipment. 2023 WL 2532836, at *3. But also, like here, it reduced the list price of comparable vehicles supposedly to account for a downward negotiation (the adjustment in *Volino* was called a "projected sold adjustment" rather than a TND) off that price. *Id.* And like here, the plaintiffs claimed that this "negotiation" adjustment was based on rigged, cherry-picked data, conflicted with actual market forces, and was inconsistent with sound appraisal methodology. *Id.* Based on the evidence presented—which effectively mirrors the evidence presented here— Judge Schofield found that "the critical common questions identified by Plaintiffs predominate over [any] individual inquiries." *Id.* at *8. After all, "[i]f the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using [the insurance company's] methodology without the [TND] will accurately value each class member's vehicle." *Id.* at *8.

Judge Schofield's analysis mirrors numerous other courts finding that predominance of common issues is established in the specific context of breach of form insurance contracts where

the plaintiff claims underpayment of ACV for a discrete reason. *See, e.g.*, *Stuart*, 910 F.3d at 376; *Hicks*, 965 F.3d at 459; *Mitchell*, 954 F.3d at 710–711; *Shields*, 2022 WL 37347, at *7–8; *Sampson*, 2022 WL 1415652, at *8; *Paris*, 2020 U.S. Dist. LEXIS 212127 at *18; *Sos*, 2019 U.S. Dist. LEXIS 139680, at *10. These persuasive orders should guide the Court's analysis here. The predominating question in this litigation—whether application of a baseless and statistically invalid TND to the listed price of comparable vehicles is permitted by the form Policy—is common to the Class. Accordingly, liability issues subject to common proof predominate over any issues subject only to individual proof.

### 3. The elements of the claims for breach of the covenant of good faith and fair dealing are subject to common proof that predominates over individualized questions.

Predominance is also satisfied with respect to whether American Family's application of the TND to comparable vehicles' listed prices constitutes a breach of the covenant of good faith and fair dealing. "Under Wisconsin law, the duty of good faith and fair dealing is implied in every contract and amounts to a guarantee by each party to the contract that he or she 'will not . . . do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *GQ Sand, LLC v. Conley Bulk Servs., LLC*, No. 15-cv-152 wmc, 2016 U.S. Dist. LEXIS 76169, at *58 (W.D. Wis. June 10, 2016) (internal citations omitted). Kansas and Missouri law is in accord. *See Salek v. Reload, Inc*., No. 11-2585-SAC, 2014 U.S. Dist. LEXIS 141530, at *31–*46 (D. Kan. Sept. 30, 2014); *Amecks, Inc. v. Sw. Bell Tel. Co*., 937 S.W.2d 240, 243 (Mo. Ct. App. 1996).

Whether a breach of the covenant of good faith and fair dealing occurred turns on the same two questions relevant to the breach of contract claim. As stated above, all Class members were subject to the same Policy language and business practices. The central question is whether application of the TND means, as Plaintiffs allege, that American Family is not calculating "market

value," but is instead calculating an artificially reduced amount. These common issues predominate over individual issues. Moreover, to take just one example, Plaintiffs allege that American Family refused to investigate or analyze whether the TND is legitimate, reflects market forces, and is based on sound empirical data. *See Watson v. Progressive Direct Ins. Co.*, 2022 U.S. Dist. LEXIS 233630, at *35–36 (E.D. Ky. Dec. 30, 2022) ("While Progressive is not expressly required to research how the PSA is calculated in its insurance policy, its commitment to pay the ACV of a total-loss vehicle carries the implied promise that the defendant ensure that its calculations reflect market realities."). It cannot be disputed that if this failure violates the covenant of good faith and fair dealing, it does so as to all members of the Class. Also, to the extent Defendants possess discretion in calculating ACV, if they exercised that discretion by assuming *all* deviations from list price reflect cash negotiations and assuming *all* transactions where a vehicle sells for list price are outliers, thereby evincing a lack of good faith, that would be true for all class members.

American Family's lack of good faith is illustrated by the same common proof applicable to the breach element of Plaintiffs' breach of contract claim. *See Clippinger*, 2022 WL 17592417, at *8 ("The Court explained above that there is a triable issue of fact about whether Plaintiff can prove the breach and damages elements of her breach of contract claim. And Plaintiff's supporting evidence of these elements could also persuade a reasonable jury that Defendant failed to act in good faith under the Policy.").

### 4. Plaintiffs' damages model fits the theory of liability, and any individual issues of damages cannot predominate over common issues of liability.

Plaintiffs' theory on the merits is that because vehicles are priced to market (which is confirmed by voluminous transactional data on vehicle sales and by Mr. Felix's testimony), the listed price of comparable vehicles, adjusted for material differences in mileage, options, and

condition (which American Family imposes and Plaintiffs do not challenge), constitutes the actual cash market value of an insured vehicle. If a jury agrees, damages are a ministerial calculation: the difference between actual market value and the artificially deflated value resulting from imposition of the TND. Merritt Rep. at 7–10; Braun Rep. ¶¶ 55–62; *see also* Newberg on Class Actions § 12:2 ("a common method for showing individual damages—a simple formula could be applied to each class member's … records—[is] sufficient for the predominance [] requirement [] to be met."). The measure of damages is the amount of the TND—calculated as the sum of the TND deductions in the appraisal reports, divided by the number of comparable vehicles utilized—plus any additional sales tax owed (in states where it is required) and prejudgment interest.[15]

This measure of damages cleanly fits the theory of liability. Plaintiffs contend American Family is liable because it thumbs the scale by applying the TND.  The fix is to remove the thumb, and it follows that the damages are the impact of the thumbing – the monetary impact of applying the TND.  *See* Braun Rep. ¶¶ 55–62. This theory of damages—the impact of the TNDs on the ACV amount—measures only the impact of the breach, i.e., application of the TNDs.

In *Volino*, where the plaintiffs alleged the PSAs were unfounded and illegitimate, plaintiffs' appraiser expert opined that Progressive's reports documented a sound appraisal of ACV following a comp methodology once the negotiation reductions are removed. *Volino*, 2023 WL 2532836*, at *4. The court agreed that a "damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory." *Id*. at *11. This is because "[i]f

---

[15] In his Report, Dr. Braun described two methods by which he could calculate class members' damages. The first method is the simplest and relies on the Audatex data which includes the amount of the TNA for vehicles in the appraisal report. Braun Rep., ¶ 55. The second method is slightly more involved and entails minor tweaks to other adjustments shown on the appraisal report that may be affected by the addition to base value that occurs when the TNA is excised. *Id.* ¶¶ 56–62.

the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle." *Id.* at *8. This is precisely the case Plaintiffs bring here.

Like *Volino*, and as seen by the numerous ACV cases cited herein, courts consistently sustain class treatment where insureds challenge discrete components of their insurers' ACV appraisals and measure damages by excising the improper discrete component. For example, in *Slade*, the plaintiff challenged Progressive's calculation of ACV stemming from its invalid calculation of the base market value of totaled vehicles. *Slade*, 856 F.3d at 411. Like here, the plaintiff did not contend the entire valuation must be scrapped, but merely that the offending portions should be excised. *Id*. The Fifth Circuit explained that once the faulty base value problem was fixed, the plaintiff could apply the third-party vendor's adjustments:

> "By essentially rerunning Defendant's calculation of ACV but with a lawful base value, Plaintiffs' damages theory only pays damages resulting from the allegedly unlawful base value. Because this condition adjustment is a separate and unrelated step from the calculation of base value, *there is no principled reason why Defendant's own condition adjustment scores could not be used* to adjust base values derived from NADA or KBB."

*Id*. (cleaned up and emphasis added); *accord Volino*, 2023 WL 2532836, at *11.

Plaintiffs' damages methodology is analogous in every material way. The only difference is that instead of replacing the base value by substituting another source in its place, as in *Slade*, Plaintiffs' proof will show that, as in *Volino*, the Audatex appraisal reports document the proper base value once the offending TNDs are excised. Further, because there is "no principled reason" why Audatex's condition adjustments cannot then be applied to the (now) proper base value, the Audatex reports also document the proper ACV. Lower courts applying *Slade* have certified for class treatment claims challenging a single problem with an ACV determination and putting on

proof of how to fix that problem, while keeping the non-offending portions. *Shields*, 2022 WL 37347, at *8 ; *Sampson*, 2022 WL 1415652, at *8. This Court should do the same.

Likewise, the Fifth, Sixth, and Eighth Circuit Courts of Appeals have upheld class certification in the more complicated real-property context where plaintiffs put on evidence that one step in a multistep appraisal process was improper and proposed a damages model of excising the offending portion of the valuation. *See, e.g., Stuart*, 910 F.3d at 375–76; *Mitchell*, 954 F.3d at 710–711; *Hicks*, 965 F.3d at 460–61. In *Hicks*, for example, the Sixth Circuit affirmed class certification where plaintiffs alleged an insurance company failed to pay the ACV of their damaged property by improperly deducting labor depreciation. 965 F.3d 452. There, as here, the plaintiffs' theory of liability was that, but for this one improper and illegal line-item adjustment, they would have received a proper payment of ACV. *Id*. at 456. And there, as here, the plaintiffs presented a damages model that simply excised that single line-item deduction. *Id*. at 460.

Moreover, as these three Circuits explained, class treatment of claims challenging a single line-item deduction is proper even where insurers attempt to argue there may have been an overpayment as to an unchallenged aspect of the ACV calculation. In *Hicks*, the insurance company argued certification was inappropriate because, even if it were not permitted to depreciate labor, "it may have miscalculated ACV payments based on individualized errors unrelated to depreciating labor costs" and these other errors may have exceeded the depreciation amount. *Id*. at 460. In other words, the insurance company intended to defend against the claims of individual class members "by proving that some insureds were not damaged because it either overestimated ACV payments to such a degree that the deduction of labor depreciation resulted in no damages or it mistakenly reimbursed labor depreciation costs to RCV claimants for more than they were owed." *Id*. The Sixth Circuit rejected this argument because "'any overestimation . . . simply

25

operates as an error in the insured's benefit.'" *Id*. at 461 (quoting *Stuart*, 910 F.3d at 376–77). And even if "this sub-issue were to become relevant at the merits stage," it might be resolvable through subclasses or bifurcation. *Id.* at 462. Likewise, in *Mitchell*, the Fifth Circuit stressed that "whether State Farm made an error in estimating" other elements of the ACV calculation "is a question separate from this class litigation," and left it to the district court to determine "how to handle sub-issues that may or may not arise in granting class relief." 954 F.3d at 711. Finally, in *Stuart*, the Eighth Circuit also rejected the insurance company's argument, holding that "the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." 910 F.3d at 376. All of this is consistent with *Volino*, which explained that arguments that an insurance company may have overvalued some other aspect of the ACV calculation "are speculative and would not defeat predominance even if they were relevant." 2023 WL 2532836, at *9.

Alternatively, as Dr. Braun explains, even if this Court or a jury were to conclude that American Family can consider *some* of the data where vehicles sold for less than list price—and even if this Court or a jury were to conclude that it is permissible to attribute such difference to negotiation rather than the more likely reasons of financing, special discount, or the presence of a trade-in vehicle—the TND can be recalculated using statistically acceptable outlier ranges. Braun Rep. at ¶¶ 40–41. Frankly, it cannot reasonably be disputed that it was wrong for American Family ███████████████████████████████████████████████████████. And it was wrong to arbitrarily decide to ████████████████████████████████████████████████████ in calculating the TND. So, even if this Court or a jury reject that the TNDs can be excised entirely,

26

Dr. Braun can recalculate the TND while otherwise using Audatex's formula except considering *all* relevant data for each price band for each region for each year.[16]

Here, the clearly predominate issue is whether American Family's and Audatex's application of the TND means class members were not paid ACV based on the actual market, but instead were paid an artificially deflated value. If the jury finds American Family liable, then the clear, common-sense remedy—just as in the numerous cases discussed above—is awarding damages calculated by backing out the invalid TND from the Audatex reports. But even if determining or calculating damages were an individualized question, this would be of no import: if liability turns on common issues, then class treatment is appropriate even if damages are individualized. *Gunnells*, 348 F.3d at 427–28 (stating Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification" and "explicitly envisions class actions with such individualized damage determinations"). And American Family cannot avoid classwide liability by arguing it needs to review individual claims to identify whether other overcalculation errors occurred or that it will take too much time to review the individual Audatex Reports:

> Even if we did accept State Farm's position that it should have an opportunity to prove individualized defenses based on its unrelated errors, any need for more time intensive review does not affect the predominance inquiry. Otherwise, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained.

---

[16] To illustrate, Dr. Braun did precisely that for all vehicles in 2020 in the $20,000.00-$25,000.00 price band. *Id.* at ¶ 41. This established that the statistically valid outlier range was 0.845-1.127—meaning, vehicles that sold for 84.5% of list price up to vehicles that sold for 12.7% more than list price. Using these parameters, the mode and median ratio is 1.0 and the mean was 0.994. *Id.* Thus, even assuming the mean is the proper indicator and even assuming all deviations down from list price can be attributed to cash negotiations, the recalculated TND for this price band would be 0.06%, not ■ as American Family speciously assumed.

*Hicks*, 965 F.3d at 462 (cleaned up).

In sum, the claims here are "sufficiently cohesive to warrant adjudication by representation." *Huyer*, 295 F.R.D. at 346. The overwhelmingly central and predominant issue in this case—whether the TND is a valid deduction to make when calculating ACV—can, and should, be resolved in a single stroke. *See Volino,* 2023 WL 2532836, at *7–11.

## C.  THE REMAINING RULE 23(a) PREREQUISITES ARE MET

### 1.  The Classes are numerous such that joinder is impracticable.

Rule 23(a)(1) requires that the proposed Class be so numerous that joinder is impracticable. There is no strict numerical test to satisfy this requirement. "[A] class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Chapman v. Wagener Equities*, Inc., 747 F.3d 489, 492 (7th Cir. 2014). "'How many (if any) of the class members have a valid claim is the issue to be determined after the class is certified.'" *Id*. But even forty class members "is a sufficiently large group to satisfy Rule 23(a)." *Swanson v. Am. Consumer Indus.*, *Inc*., 415 F.2d 1326, 1333 & n.9 (7th Cir. 1969).

Here, American Family produced claims data showing ███████████████████████ ████████████████████████████████████████████████████ ████████████████████. Braun Rep., ¶ 54. Consequently, the classes easily meet the numerosity requirement.

### 2.  Plaintiffs are typical of, and will adequately represent, the Classes.

Under Rule 23(a)(3), typicality is established where the plaintiff's claim arises from the same events giving rise to the class members' claims, and those claims are based on the same legal theory. *Vandehey v. Client Servs*., 390 F. Supp. 3d 956, 960 (E.D. Wis. 2019). "[T]he claims only need to share the same essential characteristics and need not be identical, [thus,] the typicality

28

requirement is not highly demanding." *Hazelwood v. Bruck Law Offices SC*, 244 F.R.D. 523, 525 (E.D. Wis. 2007).

American Family's practices are uniform. It is undisputed that the form Policies contain identical language, and that Defendants applied a TND to the listed price of comparable vehicles for every Class Member, which is the practice that gave rise to the claim. This case will turn on whether this uniform practice is authorized under American Family's form Policy. Clearly, Plaintiffs' claims and those of the putative Class arise from the same "practice" or "course of conduct"—applying the TND to comparable vehicles in calculating ACV—and share the same essential characteristics. *See Millwood*, 2022 U.S. Dist. LEXIS 173928, at *17 (finding typicality was established where "both the contractual language and State Farm's methodology for determining the COI rates were uniform for all class members"). Plaintiffs' claims are not only typical of, but identical to those of the Class. *See Volino*, 2023 WL 2532836, at *6–7 (rejecting Progressive's challenges to typicality and finding that, "[c]ontrary to Progressive's argument, the named Plaintiffs' claims, and Progressive's related defenses, are typical of the class as a whole.").

Plaintiffs also satisfy the Rule 23(a)(4) adequacy requirement. *See generally CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721, 724 (7th Cir. 2011) (explaining that typicality and adequacy requirements generally go hand-in-hand). Adequacy requires the Court to consider three criteria: "(1) the representative's interest cannot be contrary to those of the rest of the class; (2) the class representative must be sufficiently interested in the case outcome; and (3) class counsel must be qualified, experienced, and generally able to conduct the case." *Dokey v. Spancrete, Inc*., No. 19-CV-921-JPS, 2021 U.S. Dist. LEXIS 27715, at *13 (E.D. Wis. Feb. 12, 2021) (internal citations omitted).

Plaintiffs possess personal interests in the outcome of this case, have presented no claims that would be detrimental to the Class interests, and all Class members would benefit from a finding that the TND is improper and constitutes a breach. Moreover, Plaintiffs have demonstrated their commitment by actively participating in this litigation, producing documents, and providing discovery responses and deposition testimony. *See* Ex. 13 ("Schwartzbaum Decl.") ¶¶ 10–11; *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406 (S.D.N.Y. 2015).  Further, Plaintiffs have retained qualified counsel with experience litigating class action cases and are committed to expending the resources necessary to prosecute this claim. Schwartzbaum Decl. ¶¶ 2–8. Both Rule 23(a)(4) and Rule 23(g) are satisfied. See Fed. R. Civ. P. 23(g)(1); *see also Volino*, 2023 U.S. Dist. LEXIS 44666, at *21 ("Contrary to Progressive's argument, 'the representative parties will fairly and adequately protect the interests of the class.'"). Plaintiffs respectfully submit this Court should appoint Plaintiffs as Class Representatives and the undersigned as Class Counsel.

### D.  CLASS TREATMENT IS SUPERIOR

Factors relevant to determining whether class treatment is superior to other forms of adjudication are: (A) any interest in individually controlling prosecution; (B) whether any litigation has already commenced; (C) the desirability of concentrating litigation; and (D) manageability. Fed. R. Civ. P. 23(b)(3).

Here, Audatex's records show that the TND averaged about ███████████████ ███████████████████████████████████████████████. Braun Rep., ¶ 54. This is a relatively small amount compared to the cost of litigating against a large insurance company. In *Amchem*, the Supreme Court noted that the central policy underlying the class action mechanism is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). The Seventh Circuit has held that "'[t]he class

action is an ingenious device for economizing on the expense of litigation and enabling small claims to be litigated.'" *Thorogood v. Sears, Roebuck and Co*., 547 F.3d 742, 744 (7th Cir. 2008). Plaintiffs are unaware of any other litigation in Wisconsin, Kansas, and Missouri against American Family raising these claims—and even if there were, it would nevertheless be desirable to concentrate litigation of these claims into one court and in one action for purposes of efficiency and judicial economy. Fed. R. Civ. P. 23(b)(3)(c). In addition, it is desirable to concentrate litigation in this forum. *See In re Marriott*, 341 F.R.D. at 166 (concentrating litigation in a single forum was preferable because requiring individual trials would "require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues"). It would be an unnecessary waste of party and judicial resources to litigate the same issues in thousands of separate cases, all of which would require the same types of evidence and raise precisely the same legal issues.

Finally, class treatment is manageable. Liability will be established through common evidence of American Family's uniform Policy provisions and Defendant's systemic methods for calculating the TND and valuing total loss claims. Even if management of this action was likely to be difficult—and to be clear, it will not—"the proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members." *Easterling v. State Dep't of Corr.*, 278 F.R.D. 41, 50 (D. Conn. 2011); *accord Mullins,* 795 F.3d at 672. To be sure, class treatment is more manageable than nearly ████ individual cases, which is why manageability concerns rarely, if ever, preclude class treatment. *In re Visa*, 280 F.3d at 140 ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule"); *accord*

*Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004) (superiority is a comparative analysis and, thus, manageability concerns "will rarely, if ever, be in itself sufficient to prevent certification of a class"). Frankly, there are no manageability concerns here—identifying Class members and calculating damages are both formulaic and based on objective, verifiable data in American Family's records—and certainly none that indicate adjudicating thousands of cases is superior to class adjudication. Accordingly, classwide adjudication is superior for resolving this dispute.

## E.   ADDITIONALLY, CLASS TREATMENT IS PROPER UNDER RULE 23(c)(4) AND RULE 23(B)(2)

Rule 23(c)(4) states "[w]hen appropriate an action may be brought or maintained as a class action with respect to particular issues." "The theory of Rule 23(c)(4)(A) is that the advantage and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member." *Nelson v. Wal-Mart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007). As such, "[t]he relevant inquiry under Rule 23(c)(4)(A) is whether resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *Id.* (severing the issue of punitive damages and certifying a class on the issues of classwide liability, declaratory relief, and equitable relief).

Clearly, the critical common issue in this litigation is whether application of the TND to the list price of comparable vehicles violated American Family's contractual duties. So even if it ultimately turns out that some issues will need to be resolved individually or as part of subclasses, this does not preclude certification: There is simply no question that the overwhelmingly central and predominant issue in this case will be resolved in a single stroke. Certification is appropriate under Rule 23(b)(3) and Rule 23(c)(4). *See Jacks v. DirectSat USA, LLC*, No. 10-cv-1707, 2015 1087897, (N.D. Ill. March 10, 2015) (certifying issue class based on extensive survey of 7th Circuit

law and conclusion that collective adjudication of liability issues in class action "would further the goals of efficiency and uniformity in decision-making that underlie Rule 23").

Plaintiffs' declaratory judgment claim is also suitable for class treatment under Rule 23(b)(2). To certify a class for injunctive and declaratory relief under Rule 23(b)(2), Plaintiffs must show "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or to none of them." *Dukes*, 564 U.S. at 360. Because this case involves a uniform course of conduct and uniform interpretation of contractual language, a declaration by the jury or Court that American Family improperly appraised insureds' vehicles based on a truncated, artificially-lowered (mis)representation of the market will apply equally to all Class members or none of them. Therefore, certification is also proper under Rule 23(b)(2). *Nelson*, 245 F.R.D. at 380.

In summary, overwhelming evidence confirms that American Family's imposition of the TNDs is wrong, invalid, inconsistent with both empirical evidence and market realities, and resulted in a windfall of tens of millions of dollars to American Family at the expense of its insureds. Damages are a ministerial and formulaic calculation based on American Family's own records: the difference between actual market value and the artificially deflated value calculated by American Family through imposition of the TNDs. And even if there are set-offs or exceptions—there are not—these can be resolved through numerous options. Without class treatment, given the cost of litigating alone, American Family's insureds will have no recourse at

all and American Family will be let off the hook for the tens of millions of dollars it owes its insureds.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order:

A. Finding that Plaintiffs have met their burden to meet the prerequisites of Rule 23(a) and 23(b)(3) and certifying the damages classes; or, in the alternative, certifying the common issues in this case pursuant to Rule 23(a), (b)(3), and (c)(4);

B. Finding that Plaintiffs have met their burden to meet the prerequisites of Rule 23(a) and (b)(2) and certifying the classes for declaratory relief;

C. Appointing Plaintiff Hobbs as Class Representative for the Wisconsin class, Plaintiff Timmins as Class Representative for the Kansas Class, and Plaintiffs Scherer and Johnson as Class Representatives for the Missouri Class; and

D. Appointing Andrew J. Shamis of Shamis & Gentile, P.A., Adam A. Schwartzbaum and Scott Edelsberg of Edelsberg Law, and Jacob L. Phillips and Edmund A. Normand of Normand PLLC, as Class Counsel.

E. Within fourteen days of the date of this Order, the Parties shall file a joint proposed Notice plan for the Court's approval. If the Parties are unable to agree on a joint proposed plan, Plaintiffs shall file a proposed plan, to which Defendants shall respond within seven days.

Dated: July 17, 2023

**SHAMIS & GENTILE, P.A.**
*/s/ Andrew J. Shamis*
Andrew J. Shamis, Esq.
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
*/s/  Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq. (admitted *pro hac vice*)
Scott A. Edelsberg, Esq.
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471
Direct: (305) 975-3320
Fax: (786) 623-0915
Email: adam@edelsberglaw.com
Email: scott@edelsberglaw.com

**NORMAND PLLC**
*/s/  Jacob L. Phillips*
*/s/ Joshua R. Jacobson*
Joshua Jacobson (admitted *pro hac vice*)
Edmund A. Normand (admitted *pro hac vice*)
Jacob L. Phillips (admitted *pro hac vice*)
3165 McCrory Place, Suite 175
Orlando, FL 32803
Telephone: (407) 603-6031
Email: jjacobson@normandpllc.com
Email: ed@normandpllc.com
Email: jacob.phillips@normandpllc.com

*Counsel for Plaintiffs and the Proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that on July 17, 2023, a true and correct copy of the foregoing was electronically filed through the Court's ECF system. Notice of this filing will be sent by operation of the Court's ECF system to all counsel of record.

*<u>/s/Joshua R. Jacobson</u>*
Joshua Jacobson