# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

SABRINA TIMMINS, HOLLY JOHNSON, ELAINE SCHERER, and TONIA HOBBS, individually and on behalf of all others similarly situated,

        Plaintiffs,

        v.

AMERICAN FAMILY INSURANCE COMPANY and AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., Wisconsin corporations,

        Defendants.

Case No. 3:22-cv-00214

**CLASS ACTION**

**JURY TRIAL DEMANDED**

<u>**MOTION TO STRIKE OR EXCLUDE DR. BRADLEY BRAUN'S REPORT AND OPINIONS**</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

RELEVANT BACKGROUND ....................................................................................3

    A.    Braun's Expert Disclosures Are Deficient And Untimely............................3

    B.    Braun Confirmed Multiple Violations of Rule 26 At His Deposition ..........5

        1.    Braun's Failure to Produce the Documents He Relied on Has Severely Prejudiced the Defendants ...................................................5

        2.    Braun Testified His Report Contains False Statements....................6

        3.    Plaintiffs Failed to Disclose Braun's Testimony in Other Cases In the Last Four Years, Including Cases Involving The Same Issues......................................................................................................8

        4.    Plaintiffs Failed to Disclose Braun's Publications and Hourly Rate ........................................................................................................10

    C.    Braun's Report Fails Under *Daubert* For Multiple Reasons ........................10

ARGUMENT...............................................................................................................11

    I.    BRAUN'S REPORT AND OPINIONS SHOULD BE STRICKEN FOR NUMEROUS, REPEATED, UNJUSTIFIABLE, ONGOING, AND PREJUDICIAL VIOLATIONS OF RULE 26 .............................................11

        A.    Plaintiffs Violated Rule 26 By Failing to Make Timely Disclosures......................................................................................................12

        B.    Plaintiffs Cannot Demonstrate Their Violations Were Justified .......14

        C.    Plaintiffs Cannot Demonstrate That Their Violations Were Harmless ...................................................................................................15

    II.    BRAUN'S OPINIONS VIOLATE THE REQUIREMENTS OF *DAUBERT* AND RULE 702........................................................................17

        A.    Braun's Method for Analyzing Audatex Data for Texas and Virginia is Unreliable and Irrelevant .................................................18

1.      Braun relied on a single, undisclosed, alleged telephone conversation with a third party for his opinions ...................19

2.      Braun failed to account for "no-haggle" dealerships.............20

3.      Braun did not use statistically accepted methods to confirm that the data he relied on was a reliable predictor of the population he analyzed ..................................................24

4.      Braun failed to exclude irrelevant data about non-retail sales......................................................................................25

B.     Braun's Opinion that Sales Prices Differ from List Price Solely Due to Factors Unrelated to Market Value is Unreliable .................25

C.     Braun's Damages Methodology Violates *Comcast* Because Braun's Method of Calculating Damages Conflicts With His Liability Analysis ...........................................................................27

CONCLUSION...........................................................................................................28

Defendants American Family Insurance Company and American Family Mutual Insurance Company, S.I. ("Defendants") move to strike or exclude Dr. Bradley Braun ("Braun")'s expert testimony for violating the expert disclosure requirement of Rule 26 of the Federal Rules of Civil Procedure ("Rule 26") and to exclude Braun's July 17, 2023 Report and opinions (Dkt. 85, the "Report" or "Braun's report") submitted in support of plaintiffs' motion for class certification (Dkt. 84) under Rule 702 of the Federal Rules of Evidence ("Rule 702").[1]

## INTRODUCTION

Braun is Plaintiffs' only economic expert offered to provide a classwide methodology to establish that the ACV paid for every vehicle included in the putative classes was too low and the amount by which it was supposedly too low. But Braun's report and opinions should be excluded in their entirety for two reasons: Plaintiffs' serious disclosure violations and methodological flaws that, *by Braun's own sworn admission*, make his calculations unreliable.

*First*, Plaintiffs violated the disclosure requirements of Rule 26 without justification and to Defendants' prejudice. As a result, the Report should be excluded under Rule 37. Plaintiffs' most serious violation of Rule 26 is that, to this day, they have not produced either the dataset Braun used to perform his analyses or the steps or coding he used to create that dataset from the raw data. *See* Declaration of Christopher Assise ("Assise Dec."), ¶ 14; Dkt. 104 ("Walker Rep."), ¶¶ 60-66 nn.47, 49. By hiding Braun's analyses, Plaintiffs are shielding them from both cross-examination and meaningful evaluation, undermining the search for truth and prejudicing Defendants. Nor can this prejudice be cured, as Braun was disclosed as an expert in connection with class certification, and class certification briefing has concluded. During discovery,

---

[1] Defendants met and conferred with Plaintiffs' counsel regarding the Rule 26 portion of this dispute before filing this motion.

Plaintiffs also failed to timely disclose the raw data Braun relied on (until it was requested multiple times), a list of prior cases in which he provided expert testimony (even though he had offered directly contradictory opinions about the used car market), a list of his prior publications, or his hourly rate. Similarly, Plaintiffs failed to disclose other facts and evidence, such as a phone conversation that Braun critically relied on to support key opinions about the propriety of his dataset, and inaccurately claimed that Braun relied on materials that, at his deposition, he testified had ***never*** seen. The necessary remedy for these disclosure violations is the exclusion of Braun's opinions.

*Second*, Braun's opinions should also be excluded because his methodology does not meet Rule 702's reliability requirement. *See Am. Honda Motor Co., v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) ("when an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion"). This case involves Kansas, Missouri, and Wisconsin, but Braun relied on data from Texas and Virginia. Braun made no attempt to determine whether those states accurately represent the states at issue. Any damages or liability analysis also requires distinguishing transactions with no-haggle dealers, which Braun did not attempt to do. Braun even admitted that if the Audatex database did not apply the TNA to no-haggle dealers, his opinion would be materially affected. Ultimately, the damages methodology Braun purports to construct is based on assumptions about the frequency of negotiation that conflict with his own calculations. Accordingly, Braun's opinions do not satisfy Rule 702.

For each of these reasons, and for those set forth below, the Court should exclude Braun's opinions.

## RELEVANT BACKGROUND

### A.    Braun's Expert Disclosures are Deficient and Untimely.

Braun's Report does not comply with any element of Rule 26.  Complete expert disclosures in support of class certification were due on July 17, 2023.  Dkt. 76 (adopting proposed order); Dkt. 75-1 (proposed order).  Plaintiffs filed a copy of Braun's Report on that date, but did not serve expert disclosures by that deadline.  Assise Dec., ¶ 4.  When Plaintiffs finally served those disclosures a day late, the disclosures were incomplete and violated multiple requirements of Rule 26.  At least one crucial deficiency (Plaintiffs' failure to produce the data Braun not only considered, but relied on) remains uncured.

Plaintiffs' counsel "purchased data for list prices through MarketCheck and Cross-Sell" that Braun then analyzed.  Dkt. 85 (Braun Rep.), ¶¶ 32, 34–44.  Braun relied on that data to form the primary quantitative basis for his opinions about classwide injury and damages.  *Id.* at ¶¶ 54–56.  But Plaintiffs did not provide that data to Defendants on July 17th (or with the expert disclosures on July 18th) or at all, until Defendants affirmatively requested it.  Assise Dec., ¶¶ 5-6, Ex. 4.  Braun also allegedly relied on "Declarations of Jeremiah Kuntz and Richard Holcomb" that were not produced to Defendants with the Report.  *Id.*; *see also* Dkt. 85 (Braun Rep.), ¶ 34 n.42.

Within two days of receiving Braun's report, Defendants reminded Plaintiffs about their obligation under Rule 26 to, among other things, "***Identify and Produce All Documents, Data, and Information relied on by***" Braun.  Assise Dec., Ex. 4.  Defendants identified several examples of data and documents that appeared to be missing.  *Id.*  On July 21, 2023, Plaintiffs produced only the individual spreadsheets specifically identified as examples by Defendants.  *Id.*, Ex. 5.  Concerned that Plaintiffs had not taken their duty to provide complete disclosures seriously, Defendants asked Plaintiffs that same day to "confirm that with this [production], all

of the data that Braun considered/relied on has no[w] been produced." *Id.*, Ex. 6. Plaintiffs

assured Defendants unequivocally that "all the data that Braun considered/relied on has <u>now</u>

been either produced by us or bates numbered and specifically referenced." *Id.*

Plaintiffs' representation on July 21, 2023, was inaccurate. On August 1, 2023—less

than two weeks before Defendants' deadline to disclose experts and oppose certification—

Defendants' economic expert advised that he could not recreate or fully evaluate Braun's work

based on the limited information provided by Plaintiffs. Assise Dec., Ex. 7. Among other

things, Defendants' economic expert had discovered that (a) Plaintiffs had not produced ***any*** of

the 2018 "Cross Sell data" for Virginia analyzed by Braun (*see* Dkt. 85 (Braun Rep.), ¶¶ 32–34);

and, (b) Plaintiffs had produced less than 300,000 pieces of data for Texas, whereas Braun

claimed to summarize over 4 million pieces of data for Texas. Assise Dec., Ex. 7; Dkt. 85

(Braun Rep.), ¶ 36, Figure 4.

Defendants immediately contacted Plaintiffs to reiterate "serious concerns that Plaintiffs'

still have yet to produce all of the data Dr. Braun relied upon." Assise Dec., Ex. 7. Defendants

explained that they could not "know all of the data Dr. Braun considered (which is, of course,

why the federal rules require its identification and disclosure concurrent with expert reports),"

but identified additional examples based on what Defendants' expert had ferreted out at

considerable expense. *Id.* Defendants also pointed out that Plaintiffs still had not produced "any

of Dr. Braun's workpapers, including the workpapers wherein he runs the calculations contained

in the report." *Id.*

On August 2, 2023, Plaintiffs responded by confirming that the 2018 Virginia data had

not been timely produced and provided an updated dataset that included over 40 million data

points for Texas. *Id.*, Ex. 7. As for Braun's missing workpapers and other documents, Plaintiffs

stated "***there are no documents or data on which Dr. Braun relied in forming his opinions that have not been produced***," and told Defendants that they should wait for Braun's deposition to learn about what "commands" he used "to filter the data and whatnot…." *Id.*

On August 3, 2023, Plaintiffs again claimed that they had fully complied with Rule 26, stating: "[W]e have spoken to Dr. Braun again concerning your August 1, 2023 email and ***it is our understanding that we have produced everything that is required to be produced by Rule 26, and all the documents upon which Dr. Braun relied in his report in this action***." *Id.*, Ex. 8. That assurance, however, rang hollow as Plaintiffs simultaneously asked Defendants to "specify if there is still a specific document that you think we may have forgotten to produce." *Id.* Within minutes, Defendants objected that they "are not in a position to identify things that were not disclosed" because they "cannot know – for example – what else Dr. Braun may have considered or relied on but did not list in his report." *Id.* Given the multiple Rule 26 violations already uncovered by that point, Defendants "reserve[d] all rights to seek redress" should additional violations emerge. *Id.*

**B.  Braun Confirmed Multiple Violations of Rule 26 At His Deposition.**

**1.  Braun's Failure to Produce the Documents He Relied On Has Severely Prejudiced The Defendants.**

At deposition, Braun confirmed that, notwithstanding Plaintiffs' multiple representations to the contrary, Defendants had not received the actual dataset that Braun considered or relied upon as required under Rule 26. Defendants showed Braun a list of files provided by Plaintiffs that Plaintiffs had repeatedly represented contained all of the "documents or data on which Dr. Braun relied in forming his opinions." Assise Dec., ¶¶ 11-13, Exs. 9, 10. Braun admitted that those files merely accounted for raw data files, which he had transformed to create the actual dataset relied upon in his report. Dkt. 102 ("Braun Dep.") at 108:7-111:24. The raw data was

"cleaned" and "filter[ed]" using a software package (known as Python) to generate an initial

dataset file, which was then exported into another software package, known as "R." The dataset

exported into R has not been produced. Once this unproduced dataset was loaded into R, Braun

applied a statistical technique (known as Tukey's method) to create yet another "new file," on

which he actually "performed [his] calculations." *Id.* at 113:15-21. This file that Braun actually

analyzed has also not been produced. Even as of the date of this filing, Defendants have not

received the actual dataset Braun used for his calculations and opinions, or even the intermediate

file created by Python. Assise Dec., ¶ 14.

Even to this day, Defendants cannot recreate or respond to Braun's assertions. *See* Dkt.

104 (Walker Rep.), ¶¶ 60-66 nn.47, 49. Defendants cannot definitively ascertain what categories

of sales, or other datapoints, Braun included or excluded to support his opinions on class

certification. Dkt. 104 (Walker Rep.) at ¶ 64; Dkt. 119 (Walker Dep.) at 161:10-25. Inability to

prepare for Braun's deposition is prejudicial enough, but even at his deposition Braun could not

clearly answer whether certain categories of irrelevant transactions such as wholesale auction

(rather than retail) sales (Dkt. 102 (Braun Dep.) at 122:5-8), specialty commercial vehicle sales

(*id.* at 123:15-18), or vehicle leases (*id.* at 124:8-23)[2]—were included or excluded in the final,

cleaned, filtered, and processed dataset Braun actually used. Thus, even after using the available

discovery tools, Defendants do not even know which sales Braun analyzed.

### 2. Braun Testified His Report Contains False Statements.

At deposition, Braun testified that counsel added numerous citations to materials that

Braun had not seen and/or relied upon to form his opinions. Dkt. 102 (Braun Dep.) at 132:18-

---

[2] In several instances, Braun testified that he did not even know if these vehicles were included in the raw data and presumed they "would have" been filtered out of the raw data. *See* Dkt. 102 (Braun Dep.) at 123:14-24; 126:3-13.

134:3.  With limited deposition time, Defendants could not ascertain the full extent to which this

occurred, other than that it impacted a significant number of citations in the Report.  *Id.* at 132:8-

13 (admitting he had not seen AUDTIM_0000576-581, which alone was cited **19 times** in the

Report); Dkt. 85 (Braun Rep.) at 4, n. 6, 7, 8, 9, 10, 11, 16, 17, 20, 21, 22, 23, 24, 25, 26, 35, 44,

45.  But this one example illustrates how the false citations throughout Braun's Report

prejudiced Defendants.

      The false statements in Braun's Report resulted in Braun failing to disclose facts he relied

on in forming his conclusions.  For example, the Report states Braun "selected" and relied on

data from Texas and Virginia (as opposed to any of the three states at issue) because he "know[s]

how sold price is presented in th[at] data."  *Id.*, ¶ 34.  Braun's report identified "declarations

from Jeremiah Kuntz and Richard Holcombe [sic]" as the basis for his opinions that those states

were proper to analyze.  *Id.*, ¶ 34, n. 41.  But Braun disavowed any familiarity or reliance on

those declarations.  When shown the Kuntz Declaration, Braun responded, "I didn't actually read

this" and "didn't rely on this declaration."  Dkt. 102 (Braun Dep.) at 90:24-91:20, 92:9-12.

When shown the Holcomb Declaration, he likewise stated it was not "a document that [he] relied

on in rendering [his] expert opinion" (*id.* at 98:9-23) and that, to the best of his recollection, he

never "read[] any declarations from Holcomb."  *Id.* at 191:15-192:5.

      At deposition, Braun revealed for the first time that, instead of the Kuntz and Holcomb

declarations, his opinions actually relied on an alleged and undisclosed "conversation" with

Kuntz on an unknown date.  *Id.* at 91:25-92:5, 99:9-16.  Relying on Braun's report, Defendants

had tracked down testimony by Kuntz in a prior action where Kuntz had disavowed the precise

declaration cited in Braun's report.  *See* Assise Dec., ¶15, Ex. 11 at 86:14-17; 94:17-95:22

(deposition transcript in which Kuntz testifies that "dealer prep fees" "can be, I believe, included

in the price of the vehicle on the – on the window sticker" and agrees that the "cost of transportation of the motor vehicle prior to its sale" is likewise "included in the sale price."). This testimony by Kuntz directly refutes the "facts" that led Braun to conclude using Texas and Virginia data would be proper. In light of Braun's report and testimony, Defendants had no reason to depose Kuntz a second time about that declaration.

Had Defendants known that Braun's opinions turned exclusively on an undisclosed conversation, rather than the sources actually disclosed in Braun's Report, Defendants would have deposed Kuntz before deposing Braun, and certainly before the due date for the opposition to class certification. *Id.*, ¶ 16. Neither option was available to Defendants due to Plaintiffs' failure to disclose the supposed conversation until Braun's deposition—just two days before the opposition to class certification was due. Among other things, Defendants would have explored the truth of Braun's claims and how Kuntz (whose entire career was spent working in Texas) could possibly be familiar with the Virginia data upon which Braun relies, whether any conversation between Braun and Kuntz actually occurred, and what was discussed.

### 3. Plaintiffs Failed To Disclose Braun's Testimony In Other Cases In the Last Four Years, Including Cases Involving the Same Issues.

Plaintiffs and Braun also failed to disclose Braun's testimony in other matters during the last four years as required by Rule 26. Despite assuring Defendants twice that they had made all required disclosures (Assise Dec., Exs. 6, 8), Defendants discovered at Braun's deposition that Braun had provided testimony within the last four years in at least ***thirteen matters—none of which were disclosed in the Report or during subsequent exchanges with Plaintiffs***. Dkt. 102 (Braun Dep.) at 160:14-24, 162:22-10; Assise Dec., ¶ 17. Several of the undisclosed matters were handled by the Plaintiffs' counsel, who assured Defendants that Braun's disclosures were complete. *See* Dkt. 102 (Braun Dep.) at 163:11-3.

In addition, Defendants learned at Braun's deposition that he had offered opinions adverse to insurance companies in every undisclosed matter. *Id.* at 163:14-16. When asked whether any of those cases were "disputes about actual cash value," Braun answered, "I don't believe it had anything to do with cash value." *Id.* at 161:3-6; *see also id.* at 161:10-13 ("Q. Okay. So none of the cases you were deposed in within the last three years had to do with actual cash value or the valuation of automobiles? A. Correct."). And when asked whether any of the cases "ha[d] to do with the dynamics of the used car market in any way," Braun flatly responded "No" (*id.* at 161:14-16), before Plaintiffs' counsel confessed on the record that Braun's testimony was false: they were aware of at least two such undisclosed cases (*id.* at 166:18-21).

Braun not only opined on the "actual cash value" of total loss vehicles in those undisclosed cases, but also provided extensive testimony about the used car market—matters central to this case. *See, e.g.*, Assise Dec., Ex. 13 at 2 ("determination of market value as an economic principle is designed to account for unique factors in a given market and should not be rigidly applied" and "numerous factors can be considered or not considered to determine a reasonable method of determining market value"), 3 ("in the used automobile context, the best proxy for market value is the amount paid by the consumer"), 5 (noting that "negotiated price" is a feature of competitive markets and electing not to include that feature in a listing of conditions that "do not hold true" for the used car market). And in at least one prior ACV case, Braun offered opinions that ***directly conflict with statements made in his expert report in this case***. *Compare* Assise Dec., Ex. 13 ("**Market Value is not the same thing as Market Price**") (emphasis in original); *with* Dkt. 102 (Braun Dep.) at 27:3-8 (testifying "market value and market price" are "the same" for purposes of determining ACV). Because Plaintiffs did not timely disclose any of Braun's prior matters against insurers, Defendants could not fully cross-

examine Braun about these prior opinions on ACV and used car market before they submitted their Opposition.

### 4. Plaintiffs Failed to Disclose Braun's Publications and Hourly Rate.

Plaintiffs and Braun also failed to disclose *any* publications from the last ten years. Assise Dec., ¶ 17. Prior to his deposition, Defendants located a five-year-old CV for Braun, which revealed that he has published numerous times in the last ten years. *Id.*, Ex. 14; Dkt. 102 (Braun Dep.) at 130:16-20 (confirming 2018 CV was accurate as of that date). Plaintiffs and Braun also failed to disclose Braun's hourly rate until his deposition. *Id.* at 161:24-162:11 ("I must have left it out").

### C. Braun's Report Fails Under *Daubert* For Multiple Reasons.

The Report analyzes and provides summary statistics for Texas and Virginia state DMV sales data given to him by Plaintiffs' counsel, who bought the data from vendors. Dkt. 85 (Braun Rep.), ¶¶ 32–42. The Texas and Virginia sale data covers 2018–2021, whereas the putative classes in this action cover 2016 through April 2020. *Id.* at ¶ 33. Based on these summary statistics, Braun concludes that "the list price of used autos most accurately reflects or is representative of market value," making the application of TNAs inappropriate. *See id.* at ¶¶ 43–53. But Braun does not use any of the customary statistical models to determine whether this Texas or Virginia data accurately describes vehicle sales in Kansas, Missouri or Wisconsin, or to determine whether data from 2018-2021 is likely to accurately reflect sales between 2016 and April 2020. These omissions are particularly glaring because key metrics Braun calculated (such as the percentage of vehicles sold at list price) change significantly in 2020, and Texas and Virginia evidence statistically significant differences even when compared to each other. Dkt. 104 (Walker Rep.), ¶¶ 63, 71.

Finally, Braun describes a method of calculating damages for the proposed classes, which involves removing the TNA and making other adjustments necessary to account for the effects of removal on appraisals. *See* Dkt. 85 (Braun Rep.), ¶¶ 54–62. But Braun's Report makes clear that these calculations are based on the assumption that vehicles in Kansas, Missouri, and Wisconsin always sell at list price, when Braun's own data analysis specifically demonstrates that is not actually the case, thereby creating a mismatch between Plaintiffs' theory of liability and their damages model.

## ARGUMENT

## I. BRAUN'S REPORT AND OPINIONS SHOULD BE STRICKEN FOR NUMEROUS, REPEATED, UNJUSTIFIABLE, ONGOING, AND PREJUDICIAL VIOLATIONS OF RULE 26.

Rule 26 mandates that parties "timely disclose their expert witnesses in accordance with any deadlines set by the district court." *Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966, 972 (7th Cir. 2015). Those disclosures ***must*** include a written report, prepared and signed by the witness that contains: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi).

Plaintiffs and Braun violated almost all of these requirements without justification and, to this day, have prejudicially failed to produce the actual dataset Braun relied upon for his opinions or the coding necessary to recreate that dataset, preventing Defendants from fully cross-examining Braun and testing his opinions. "The purpose of Rule 26(a)(2) is to provide notice to

opposing counsel—***before the deposition***—as to what the expert witness will testify." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (emphasis added). Seventh Circuit law is clear that "[f]ailure to comply with the disclosure requirements of Rule 26(a) results in ***automatic and mandatory exclusion*** of the proffered witness 'unless the failure was substantially justified or is harmless.'" *Novak*, 777 F.3d at 972 (emphasis added) (quoting Fed. R. Civ. P. 37(c)(1)). Deficient Rule 26(a)(2) disclosures cannot be cured "by supplementing them with later deposition testimony." *Ciomber*, 527 F.3d at 642. The Court thus should exclude Braun's report and opinions.

### A.     Plaintiffs Violated Rule 26 By Failing to Make Timely Disclosures.

The Braun Report violated nearly every requirement of Rule 26(a)(2)(B).

***First***, the Braun Report did not disclose all facts and data Braun considered and relied upon, and to this day Plaintiffs have not produced the actual dataset that Braun relied upon to render his opinions. Instead, Plaintiffs produced raw data that Braun later manipulated and massaged through a multi-step process, rendering it impossible for Defendants to recreate Braun's final dataset and directly test Braun's opinions, because Plaintiffs also did not provide all of Braun's coding or a complete list of the steps he used to filter his data. *See* Dkt. 104 (Walker Rep.), ¶¶ 60-66, nn.47, 49. Plaintiffs further violated the letter and spirit of Rule 26 by representing that Braun relied upon materials he had never seen and/or considered, while simultaneously concealing the fact that Braun's opinions depend on facts (such as an alleged conversation with Kuntz) until the day of Braun's deposition. *See* Dkt. 102 (Braun Dep.) at 91:4-92:12; 98:12-99:16. Defendants cannot possibly determine what questions to ask at an expert's deposition—and what formal or informal discovery to conduct in advance—without accurate information about the purported bases for an expert's opinions. *See Ciomber*, 527 F.3d

at 643. Braun's failure to accurately disclose the facts and data he relied on alone warrant exclusion of Braun's Report and opinions.

**Second**, even the raw data Plaintiffs did eventually produce was untimely. Plaintiffs did not produce **any** of the Texas and Virginia data on which Braun relied until Defendants specifically demanded its production. Assise Dec., ¶¶ 5-6, Exs. 4. Even then Plaintiffs omitted an entire year's worth of data for Virginia and provided less than 10% of another data file. *Id.*, Exs. 6-7. These defects were not cured until less than two weeks before Defendants' Opposition and expert disclosures were due. *Id.*, Ex. 7.

**Third**, Plaintiffs failed to disclose at least thirteen other cases where Braun had given testimony adverse to insurers in the past four years, including in cases about ACVs and the used car market. *See* Dkt. 102 (Braun Dep.) at 160:11-161:2; 162:22-163:19; Assise Dec., ¶ 17, Ex. 12. Plaintiffs did not provide the list of thirteen cases until after Braun's deposition, thereby preventing a full and complete cross-examination about Braun's prior opinions, including prior inconsistent statements. *Id.*

**Fourth**, Plaintiffs failed to disclose any of Braun's publications in the past 10 years, forcing Defendants to make-do with an out-of-date 2018 CV Defendants found through their own efforts. Dkt. 102 (Braun Dep.) at 129:4-130:20, Assise Dec., Ex. 14. Plaintiffs did not even bother to disclose Braun's hourly rate until his deposition. Dkt. 102 (Braun. Dep.) at 161:24-162:11.

On this undisputed record, Plaintiffs violated numerous requirements of Rule 26, making Braun's report and opinions subject to automatic exclusion under Rule 37 unless Plaintiffs can demonstrate that their violations were "substantially justified" or "harmless."

**B.  Plaintiffs Cannot Demonstrate Their Violations Were Justified.**

Plaintiffs cannot credibly argue that their persistent, repeatedly, and ongoing violations of Rule 26(a)(2)(B) are substantially justified.

*First*, there is no possible justification for Plaintiffs' failure and ongoing refusal to produce the actual dataset or coding that Braun used to perform the analyses described in his report, which form the bases for his opinions and for Plaintiffs' motion for class certification. Assise Dec., ¶ 14; Dkt. 104 (Walker Rep.), ¶¶ 60-66 nn.47, 49.

*Second*, there is no justification for Plaintiffs' failure to disclose Braun's prior expert work (on *thirteen* matters), publications over the past ten years, and reliance on an alleged conversation with Kuntz until mid-deposition—in other words, Plaintiffs never cured those defects until it was too late.  *Ciomber*, 527 F.3d at 642 (holding parties cannot cure deficient disclosures "by supplementing them with later deposition testimony").  Each of those failures are particularly unjustified because Defendants repeatedly asked Plaintiffs to ensure that they had provided complete disclosures and Plaintiffs repeatedly represented that they had taken steps to ensure the completeness of the disclosures.  Assise Dec., Exs. 6, 8.  Plaintiffs' counsel cannot claim ignorance of these oversights because Plaintiffs have worked with Braun before and thus knew his disclosures were incomplete and inaccurate.  *E.g.*, Dkt. 102 (Braun Dep.) at 166:18-21 (correcting Braun about the number of prior cases in which he opined on ACV).  If anything, Plaintiffs had a heightened duty to ensure complete and accurate disclosures because Braun was previously stricken as an expert for failing to comply with Rule 26(a)'s disclosure requirements. *Kramer v. Camden USA, Inc.*, 2022 WL 1395609 (M.D. Fla. Mar. 31, 2022).[3]

---

[3] Plaintiffs' pattern and practice of failing to comply with Rule 26 for other experts further militates against any finding of substantial justification.  By the time Braun was deposed, both of Plaintiffs' other experts had already admitted that their own disclosures were incomplete.  *e.g.* Dkt 98 (Merritt Dep.) at 68:10-70:16 (confirming Merritt's report failed to disclose two matters

***Third***, no substantial justification can exist for the affirmative act of adding citations that an expert has never seen to an expert report. Dkt. 102 (Braun Dep.) at 132:18-134:3. While some involvement by counsel in drafting is expected and normal, altering the citations in an expert's report ***without*** confirming that the expert in fact relied on the newly-cited materials, distorts the record and, as occurred here, wastes time and causes confusion.

### C.      <u>Plaintiffs Cannot Demonstrate That Their Violations Were Harmless.</u>

Because Plaintiffs lack any substantial justification for their violation of Rule 26, Braun's Report must be stricken unless Plaintiffs can demonstrate that their violation was "harmless." *Novak*, 777 F.3d at 972. But Plaintiffs' violations of Rule 26 harmed and prejudiced Defendants in at least four respects.

***First***, because Plaintiffs have never disclosed the final dataset Braun actually analyzed and relied upon after filtering and manipulating the raw data, or the coding used to create that final dataset, Defendants' expert had to expend time and money attempting—without success— to recreate that dataset. Dkt. 104 (Walker Rep.), ¶¶ 60-66, nn.47, 49. By violating this mandatory disclosure requirement, Plaintiffs have effectively immunized Braun's opinions from meaningful testing, review, and cross examination by Defendants. To make matters worse, Plaintiffs attacked Defendants' expert during his deposition about what datapoints do, and do not, reside within Braun's as-yet-undisclosed final dataset.

***Second***, Plaintiffs did not provide even a complete set of the raw data for Texas and Virginia until less than two weeks before Defendants' opposition to class certification was due. The delay left Defendants and their expert with insufficient time to fully review and analyze the

---

in which he had provided expert reports and testimony within the last four years); Dkt. 97 (Felix Dep.) at 139:15-141:24 (confirming Felix's report failed to disclose two matters in which he had provided expert reports and testimony within the last four years).

over **40 million** pieces of data for Texas and Virginia, forcing Defendants to make do with a

partial analysis of the data. Rule 26 and court-ordered expert disclosure deadlines exist precisely

to avoid exactly this type of unfairness.

**Third**, Defendants were prejudiced in their ability to cross examine Braun because

Plaintiffs failed to disclose any of at least thirteen prior cases where Braun testified against

insurers. Compounding the prejudice, Braun proved unable to accurately describe the prior

matters at deposition, some of which involve the same issues in this case. Dkt. 102 (Braun Dep.)

at 160:14-161:16. Since then, Defendants have learned that Braun offered opinions in prior

matters that either directly contradict his testimony in this case (*compare id.* at 27:3-8 *with*

Assise Dec., Ex. 13 at 3), or that bolster positions Defendants advocate for here (Assise Dec.,

Exs. 13, 15), which confirms that Plaintiffs' failure to timely disclose this information impaired

cross examination.

**Fourth**, by adding incorrect citations to two declarations in Braun's report, rather than

Braun's alleged discussion with Kunz, Plaintiffs misdirected Defendants, causing them to waste

time researching the history of the declarations and to miss an opportunity to depose Kuntz. Dkt.

85 (Braun Rep.), ¶ 34, n.42; Dkt. 102 (Braun Dep.) at 91:3-92:12; Assise Dec., ¶ 16.

Defendants' research uncovered that Kuntz had disavowed key statements in the declaration

cited in Braun's report in a deposition in another matter (Assise Dec., Ex. 11 at 58:23-59:3;

86:14-87:18; 94:17-95:22) and that Holcomb's declaration was likewise unreliable for the

purposes cited in Braun's report. If Defendants had known that Braun instead relied on a

conversation with Kuntz, they would have subpoenaed Kuntz about the supposed discussion,

rather than rely upon the existing evidence refuting the declarations. *Id.*, ¶ 16. Defendants have

every reason to believe a deposition of Kuntz would have uncovered material evidence. Kuntz

has given sworn testimony in another case that appears to contradict Braun's account of the supposed conversation. *Id.*, Ex. 11 at 58:23-59:3; 86:14-87:18; 94:17-95:22. There also is no reason to believe Kuntz would have advised Braun about Virginia vehicle sales data when Kuntz's experience was as the Director of the Title and Registration division for the Texas DMV, not the Virginia DMV. *See* Dkt. 102 (Braun Dep.) at 99:9-16. But because Plaintiffs and Braun disclosed the conversation for the first time mid-deposition, it was impossible for Defendants to subpoena Kuntz to build such a record before the deadline to oppose class certification.

As a result, Plaintiffs cannot brush aside their violations of Rule 26 as harmless, further warranting an order excluding Braun.

## II.      BRAUN'S OPINIONS VIOLATE THE REQUIREMENTS OF DAUBERT AND RULE 702

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of an expert bears the burden of demonstrating, by a preponderance of the evidence, that the testimony satisfies both *Daubert* and Rule 702. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Under that framework, an expert's testimony is inadmissible unless it is both relevant and reliable under a three-step analysis:

(1) "[T]he witness must be qualified 'as an expert by knowledge, skill, experience, training, or education'";

(2) "[T]he expert's reasoning or methodology underlying the testimony must be scientifically reliable"; and

(3) "[T]he testimony must assist the trier of fact to understand the evidence or determine a fact in issue."

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert*, 509 U.S. at 592–93 for step two and citing Fed. R. Evid. 702 for steps one and three); *see also* Fed. R. Evid. 702 (requiring expert's specialized knowledge to help the trier of fact and requiring the opinions to be based on reliable principles and methods which are reliably applied to sufficient facts and data).

Finally, to be useful at class certification, a damages model "must measure only those damages attributable" to the classwide theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "If the model does not even attempt to do that," it cannot satisfy Rule 23, and should be disregarded or excluded. *See id.*

Here, the opinions and methodologies in Braun's Report are both irrelevant and unreliable and should be excluded. [4] Specifically, the Court should exclude (1) his method for analyzing the Audatex data for Texas and Virginia as irrelevant and unreliable, (2) his assumption that deviations in the data between list and sales price can never be related to a vehicle's market value, and (3) his opinion that damages can be calculated on a classwide basis simply by "backing out" TNA from Audatex valuations.

A.     <u>Braun's Method for Analyzing Audatex Data for Texas and Virginia is Unreliable and Irrelevant.</u>

The Court should exclude Braun's opinions based on Texas and Virginia data as unreliable and irrelevant for three separate and independent reasons.

---

[4]This Motion seeks to exclude Braun as an expert based on plaintiffs' in adequate disclosures. In the event that Braun is not stricken as a result of these inadequate disclosures, this Motion asserts that the opinions in Braun's July 17, 2023 Report should be excluded under Rule 702. Defendants reserve their right to subsequently seek exclusion of the opinions in Braun's Supplemental Report (Dkt. 110) in the event such a Motion is necessary.

1.      **Braun relied on a single, undisclosed, alleged telephone conversation with a third party for his opinions.**

To be able to rely on Texas and Virginia data, Braun needed to first ascertain that the pricing information did not include fees or charges unrelated to the base price of vehicles as advertised. Braun admitted that, for purposes of his analysis, he has assumed that the Texas and Virginia data "does not include ancillary products that may have also been purchased" by, or charged to consumers, apart from the base price of a used vehicle, such as "sales tax," "title/registration fees," and "dealer or 'doc' fees." Dkt. 85 (Braun Rep.) at 34, n.42. Braun's report suggested that this belief rested on two declarations, but Braun confirmed at his deposition that it actually rests on a phone call with Kuntz on an unknown date, rather than any document, data, or empirical analysis. *See* Dkt. 102 (Braun Dep.) at 91:4-25; 92:1-12; 98:12-99:16.

Defendants are not aware of any recognized methodology that allows for sweeping conclusions to be drawn about massive datasets within millions of records based on a single alleged telephone conversation without verifying empirical analysis. Defendants also know of no professional or academic setting that would consider opinions about massive datasets reliable when they depend on an undocumented telephone conversation with a third party. Neither Plaintiffs nor Braun have pointed to or cited any acceptance of such a practice in professional or academic settings when publishing opinions. Braun's reliance on Kuntz to draw opinions is particularly untenable because (a) Kuntz only ever worked for the Texas DMV, not the Virginia DMV, yet Braun relies on Kuntz to interpret Virginia data, and (b) Kuntz testified in another case under oath that the Texas data *includes* ancillary charges such as "dealer prep fees," the "cost of transportation of the motor vehicle prior to its sale," certain "taxes," and the price for "accessories or attachments." *See* Assise Dec., Ex. 11 at 58:23-59:3; 86:14-87:18; 94:17-95:22.

Braun's reliance on a single, undocumented telephone conversation with Kuntz cannot satisfy the preponderance standard for reliability demanded by Rule 702. Braun effectively "did nothing to independently verify the reliability of" information essential to his opinions, "render[ing] [his] statistical analysis unreliable and justif[ying] excluding the opinions that rely on this information." *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013); *Black and Decker v. Bosch Tools*, 2006 WL 5156873, at *1–2 (N.D. Ill. Sept. 8, 2006) (excluding expert testimony based on conversation with other person where expert "did not independently verify any documents to confirm what [other person] said, but instead relied upon his statements.").

## 2. Braun failed to account for "no-haggle" dealerships.

Braun's opinions also should be excluded because his calculations are based on false assumptions that he has not tested using generally accepted methodologies. His calculations assumed that Audatex applied TNAs to *every* vehicle, but it is undisputed that Audatex "does *not* apply TNAs to comparable vehicles for sale by no-haggle dealers." Dkt 104 (Walker Rep.), ¶ 73. Plaintiffs protest that Braun always understood that TNAs were not applied by Audatex to every advertised vehicle. Dkt. 114 (Reply) at 7. He testified otherwise.[5] But whatever Braun's beliefs may be, he admittedly took *no steps* to filter no-haggle dealers from the data. *See* Dkt. 102 (Braun Dep.) at 128:13-17 ("Q. Did you make any effort to remove from your dataset transactions whether [sic] the car was advertised and sold by a known no-haggle dealer, like CarMax? A. Well, of course not. Why would I do that? That would distort the dataset.").

---

[5] Dkt. 102 (Braun Dep.) at 152:22-25 (asked "is it your understanding that TNA is applied to all advertised vehicles or only a subset of advertised vehicles," Braun responded without qualification: "All of them.").

Plaintiffs and Braun now suggest that assuming Audatex applied TNAs to no-haggle dealerships had no impact on Braun's conclusions. Dkt. 114 (Reply) at 7; Dkt. 116 (Braun Supp. Repp.), ¶ 17. That is not what Braun said when asked under oath in a deposition, the transcript of which he has chosen not to correct. Under oath, Braun agreed that treating no-haggle dealers as if they had been subject to TNAs would "impact his conclusions." *See* Dkt. 102 (Braun Dep.) at 153:1-3. In fact, Braun recognized that this one change in his assumptions could turn his analysis upside down. Asked whether it would "still be true" that "the most likely outcome is that a vehicle will sell for its list price" if Braun "were to remove no-haggle dealers, such as CarMax and Carvana, from the dataset," Braun responded: "Well, we ***know*** it would ***not*** be true." *See id.* at 158:7-159:2-3 (emphasis added).

An opinion based on a false assumption about economic reality—in this instance, that Audatex applied TNAs to no-haggle dealerships—is inherently unreliable. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837–38 (7th Cir. 2015) (affirming ruling that expert opinion was inadmissible when based on unsupported assumptions about a chemical's capacity to cause injuries). And Plaintiffs' attempt to rehabilitate Braun by asserting he merely forgot "in the moment that American Family did not apply TNAs to comps," does nothing to explain away Braun's admission that this fact would alter his analysis. Dkt. 114 (Reply) at 7.

Braun tries to excuse treating no-haggle dealers as if TNAs applied to their sales on the ground that no-haggle dealers account for only 1.1% of all ***dealerships*** (not sales) in the data he analyzed. Dkt. 116 (Braun Supp. Rep.)[6], ¶ 17. But Braun has already testified that excluding

---

[6] In an attempt to rehabilitate Braun's facially deficient initial report, Plaintiffs improperly submitted a supplemental report for Braun (Dkt. 110) without leave of Court in violation of the Court's scheduling order after Defendants deposed Braun and after Defendants filed their opposition to class certification. While Defendants agreed to allow Braun to submit a supplement limited to re-running Braun's calculations on the Audatex data Plaintiffs received on

no-haggle dealers would alter his analysis and the Court is free to disregard a statement that directly contradicts Braun's own sworn deposition testimony. *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 969 (7th Cir. 2020) ("Where deposition testimony and an affidavit conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken.") (internal quotation omitted); *see also Donaldson v. Johnson & Johnson*, 37 F.4th 400, 406 (7th Cir. 2022) (holding "[a] court is well within its discretion to strike an affidavit that contradicts deposition testimony unless the affiant has offered a plausible explanation for the discrepancy."). Just as important, the percentage of *dealerships* is not a meaningful metric. The important metric is the percentage of *transactions*. It is undisputed, because Braun admitted, that no-haggle dealerships have "*a disproportionately large number of transactions in the market*." Dkt. 102 (Braun Dep.) at 20:18-25 (emphasis added). Giant dealerships such as CarMax, AutoNation, and Carvana all have a disproportionately large share of the used car market (*id.* at 19:1-5, 20:7-8), and all are "no-haggle" dealers to which Audatex does not apply TNAs. Assise Dec., Ex. 16. Because of their massive volume, Braun cannot merely assume that his erroneous inclusion of their transactions had "no impact" without performing *any* statistical methodology. *See Lewis*, 561 F.3d at 705 ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method . . .") (internal quotation omitted); *Buckner v. Sam's Club,*

August 4, 2023, Defendants did not agree to permit Plaintiffs to file an untimely "rebuttal" report offering new and different opinions for the first time after Defendants had already submitted their Opposition. In all events, Plaintiffs also indicated that their supplement would be provided before August 14, 2023 (Assise Dec., ¶ 2, Ex. 1), a critical date, as that was the date on which Defendants' Opposition was due. But Plaintiffs did not submit any supplement by August 14, and instead provided what appears to be a rebuttal report on August 24. Dkt. 116.

*Inc.*, 75 F.3d 290, 294 (7th Cir. 1996) (excluding expert opinion that was "only conjecture and [was] wholly without evidentiary support.").

Braun next suggests that, based on the valuation reports for the four named Plaintiffs, he feels confident that his failure to exclude no-haggle dealers had no real impact on his analysis. Dkt. 116 (Braun Supp. Rep.), ¶ 19. As an initial matter, this rhetoric never explains how or why the frequency of no-haggle dealers appearing in Audatex reports has any relationship to the reasonableness of Braun's calculation of the TNA.[7] Even putting that issue aside, Braun does not identify or describe any accepted methodology of extrapolating from four valuation reports to thousands of valuation reports. Nor does Braun explain the error rate or confidence interval for extrapolating from the reports for the four named Plaintiffs to the entire dataset. This supposed justification for treating no-haggle dealers as if they had been subject to TNAs is no better than conjecture and guesswork. *See Lewis*, 561 F.3d at 705; *Buckner*, 75 F.3d at 294.

As a result, the Court should exclude Braun's opinions based on the Texas and Virginia data as resting on a faulty assumption about economic reality. The error is particularly fatal at class certification because, as matters stand, Braun does not know whether he "measure[d] only those damages attributable to [Plaintiffs'] theory," or instead improperly seeks to hold Defendants liable based on TNAs that Audatex did not apply. *Comcast Corp.*, 569 U.S. at 35.

---

[7] An example makes the absurdity of Braun's statement clear. Braun's argument is akin to including California citizens in the calculation of "average salary of US citizens residing outside of California," then trying to justify that inclusion by claiming that the inclusion of California citizens is irrelevant because California is only 2% of the states in the United States without any other empirical analysis.

3. **Braun did not use statistically accepted methods to confirm that the data he relied on was a reliable predictor of the population he analyzed.**

The putative classes cover Kansas, Missouri, and Wisconsin, but Braun analyzed only DMV data for Virginia and Texas. *See* Dkt. 85 (Braun Rep.), ¶¶ 32–42. As an initial matter, Braun agrees that neither Texas nor Virginia sales have anything to do with the calculation of the TNA in Kansas, Missouri, and Wisconsin during the class period. *Id.,* ¶¶ 18, 19. Braun also acknowledges that while the class period ranges from 2016 until April 30, 2020, the State DMV data Braun analyzed covered 2018-2021, a time period that—unlike the class period—included the substantial impact of Covid-19 on the used car market. *Id.*, ¶ 33.

Critically, however, Braun never undertakes *any* empirical analysis (let alone an analysis using generally accepted statistical methods) to determine whether the data he relied on was a statistically reliable predictor of the population at issue in this action. Most obviously, Braun failed to use *any* statistically accepted method to determine whether Texas and Virginia sales data are reliable predictors of sales practices in Kansas, Missouri, and Wisconsin. Instead, Braun simply *assumed* they were, despite himself admitting that the used car market is "regionalized." Dkt. 102 (Braun Dep.) at 11:6-12, 12:23-13:1.[8] Nor did Braun undertake any empirical analysis to determine whether 2020 and 2021 sales data was an accurate depiction of the pre-Covid-19 pandemic used automobile market, even though *Plaintiffs' own pleadings in this case have asserted that COVID-19 impacted used car* pricing and sales practices. *E.g.*, Dkt. 1, ¶ 20. Because Braun has not used any generally accepted method to test whether the population from

---

[8] Braun's reliance on assumptions, rather than a generally accepted empirical analysis to conclude whether Texas and Virginia are representative of Wisconsin, Kansas, and Missouri is particularly problematic because a comparison of those states to one another indicates that they themselves have statistically significant differences from one another (Dkt. 104 (Walker Rep.), ¶ 71).

which he drew his data is predictive of the states and time period about which he opines, Braun's

analysis fails under *Daubert* and should be excluded.

### 4. Braun failed to exclude irrelevant data about non-retail sales.

Braun's failure to filter out a host of irrelevant data, coupled with his decision not to

provide any analysis concluding whether this irrelevant data would impact his conclusions, also

prevents Braun from satisfying *Daubert*'s reliability standard. During Braun's deposition, he

expressly agreed that "the wholesale car market is totally different than the retail car market."

Dkt. 102 (Braun Dep.) at 122:16-17. He also conceded that if "fleet sales" were in the State

DMV data, he did not remove them," (*id.* at 123:2-13) and that "tractor-trailers, limos, heavy

trucks, and buses sold for commercial use" (*id.* at 123:15-17) as well as lease transactions should

not have been included in the dataset he analyzed. *Id.* at 123:15-24, 126:3-13. But it appears as

though Braun *included* all of these transactions in his analysis. Dkt. 104 (Walker Rep.), ¶ 64

(noting Braun's report does not discuss "having filtered out such records," and "the number of

records underlying his Tables C and D summarizing his Texas and Virginia data" appears to

confirm that he did not filter them out). Nor did Braun conduct any analysis (using any

statistically reliable method) to determine that the inclusion of these records, which Braun

himself admits should be excluded, had no material impact on Braun's calculations. As a result,

Braun has failed to reliably apply his method by not filtering out data that even he recognized

should have been removed prior to preparing summary statistics. *See* Fed. R. Evid. 702(d).

### B. Braun's Opinion that Sales Prices Differ from List Price Solely due to Factors Unrelated to Market Value is Unreliable.

Braun's opinion that sales prices differ from list prices solely due to factors unrelated to

market value is not based on any statistical method and must thus be rejected. Braun's Report

asserts that "it is impossible to determine whether the sold price" of a used car "is reflective of

market price" if any component of the transaction is unknown.  Dkt. 85 (Braun Rep.), ¶ 53.  But Braun then opines—without any economic or statistical basis—that the "assumption that used vehicles typically sell below list price because of negotiation is not supported by the data." *Id.*, ¶ 24.  Critically, Braun never explains how his data can indicate anything about market prices or the impact of negotiation if it is impossible to determine from the data whether sold price is the market price.  As a result, Braun has not demonstrated that his conclusion on this point is sufficiently reliable to be considered.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (excluding testimony where there is far "too great an analytical gap between the data and the opinion proffered").

But even putting aside this unexplained logical gap, Plaintiffs' conclusion that "the assumption that used vehicles typically sell below list price because of negotiation is not supported by the data" also fails under *Daubert* because Braun has not based this conclusion on any generally accepted statistical or economic method.  Instead, Braun bases this conclusion on the testimony of another of Plaintiffs' experts, Kirk Felix, who postulates various factors other than negotiation that might cause a vehicle to sell below list price.  Dkt. 85 (Braun Rep.), ¶ 25.  But Braun has not conducted ***any*** analysis to determine how often any of these explanations occur, let alone performed an analysis using a generally accepted methodology.  Nor does Braun posit a way he could do so, as Felix himself admitted that ***he has no idea how often any of his alternative explanations for what appears to be negotiation*** occur.  Dkt. 97 (Felix Dep.) at 215, 220-25, 232, 236, 237, 239; Dkt. 102 (Braun Dep.) at 134:24-25; 135:1-2 (admitting Braun had no data "about the frequency with which any of [Felix's] examples arise").  Without this frequency data, "there is no 'rational connection' between [Braun's] data and his opinion," making it inadmissible.  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 786 (7th Cir. 2017)

(quoting *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013)); *see also Korte v. Exxonmobil Coal USA, Inc.*, 164 Fed. Appx. 553, 557 (7th Cir. 2006) (affirming exclusion of expert testimony when expert "formed his opinion without sufficient scientific evidence confirming the validity of [his] premise.").

    C.    **Braun's Damages Methodology Violates *Comcast* Because Braun's Method of Calculating Damages Conflicts With His Liability Analysis.**

The Supreme Court has made clear that any proposed expert methodology for calculating damages on a classwide basis "must measure only those damages attributable to [Plaintiffs'] theory." *Comcast Corp.*, 569 U.S. at 35. But Braun's proposed classwide methodology does no such thing. Instead, Braun's methodology calculates what damages would hypothetically be if the Court assumes different facts than those on which Braun's liability analysis is based.

Braun's damages analysis is little more than high school algebra. Braun states that *if* he assumes the correct measure of damages is to set the TNA to zero, he can then re-calculate what valuation would have been calculated without the application of a TNA. Dkt. 85 (Braun Rep.) ¶¶ 56-61. Phrased differently, Braun opines that if he assumes ***no vehicles sell for less than their list price***, he can back out the impact of the TNA. But Braun's own calculations make clear that a meaningful percentage of any 30-vehicle sample would sell at less than the list price. Dkt. 102 (Braun Dep.) at 72:21-25 ("Q . . . half of the sales you observed in Texas had a sale price less than that advertised price; is that right? A. Yes."), 194:1-13 (changing his testimony to state at least 38% of vehicles sell at less than list price). By ignoring this 38-50% of vehicles, Braun has calculated damages using a model that differs from his underlying liability analysis. As a result, Braun's damages methodology is not reliable. *Comcast Corp.*, 569 U.S. at 35; *see also Kempner Mobile Elects., Inc. v. SW Bell Mobile Sys.*, 428 F.3d 706, 712–13 (7th Cir. 2005)

(affirming exclusion of expert testimony on damages where expert failed to separate recoverable and unrecoverable profits).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude Braun under Rule 26 and Rule 702. And Defendants respectfully request that the Court rule on this motion before ruling on the class certification motion.  Dkt. 84.


Dated: September 12, 2023

Respectfully submitted,

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra, State Bar No. 1033159
Tanner G. Jean-Louis, State Bar No. 122401
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P. O. Box 927
Madison, WI 53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
szylstra@boardmanclark.com
*Attorneys for Defendant American Family*
*Insurance Company*


Christopher M. Assise
Joan Hayner (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7141
Facsimile: (312) 853-7036
cassise@sidley.com
jhayner@sidley.com
*Attorneys for Defendant American Family*
*Insurance Company and American Family*
*Mutual Insurance Company*